**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------x

DUNKIN' DONUTS FRANCHISED                    :
  RESTAURANTS LLC,                           :
  a Delaware Limited Liability Company,      :
DD IP HOLDER LLC,                            :
  a Delaware Limited Liability Company,      :
BASKIN-ROBBINS FRANCHISED SHOPS LLC, :
  a Delaware Limited Liability Company,      :
BR IP HOLDER LLC,                           :
  a Delaware Limited Liability Company,      :
                                                                              :

                    Plaintiffs,              :
                                                                                   :
           v.                                 :    C.A. No. 07-CV-3612 (LMM)
                                :

KNZ 110th LEXINGTON, LLC,                    :
  a New York Limited Liability Company,     :
KNZ 161 BROADWAY DONUT, LLC,                 :
  a New York Limited Liability Company, and  :
KNZ 149 BROADWAY DONUT, LLC,                 :
  a New York Limited Liability Company,      :
                                                                             :
                    Defendants.              :
------------------------------------------------------------x

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
## MOTION FOR PRELIMINARY INJUNCTION

Ronald D. Degen, Esq.  (RD 7808)      Robert L. Zisk (RZ 1275)
Scott Goldfinger, Esq.  (SG 9219)      David E. Worthen (DW 8519)
O'ROURKE & DEGEN, PLLC           GRAY, PLANT, MOOTY, MOOTY
225 Broadway, Suite 715            & BENNETT, P.A.
New York, New York 10007         2600 Virginia Avenue, N.W., Suite 111
Telephone:   (212) 227-4530       Washington, DC 20037
Facsimile:    (212) 385-9813       Telephone:   (202) 295-2200
E-mail:       rdegen@odlegal.com    Facsimile:    (202) 295-2250

                                                          Collin B. Foulds (CF 5656)
*Attorneys for Plaintiffs*             GRAY, PLANT, MOOTY, MOOTY
Dunkin' Donuts Franchised Restaurants LLC, & BENNETT, P.A.
DD IP Holder LLC,                 500 IDS Center
Baskin-Robbins Franchised Shops LLC, and  80 South Eighth Street
BR IP Holder LLC                  Minneapolis, Minnesota 55402
                                                          Telephone:   (612) 632-3388
Dated: May 11, 2007                Facsimile:    (612) 632-4388

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... ii

INTRODUCTION ........................................................................................................ 1

FACTUAL BACKGROUND ........................................................................................ 2

ARGUMENT ............................................................................................................... 10

A.    THE DEPLORABLE CONDITION OF DEFENDANTS' SHOPS
      HAVE CAUSED AND CONTINUES TO CAUSE IRREPARABLE
      INJURY TO PLAINTIFFS' REPUTATION AND GOODWILL
      FOR WHICH NO ADEQUATE REMEDY AT LAW EXISTS ..................................... 11

B.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ................................... 14

C.    THE BALANCE OF HARM WEIGHS DECISIVELY IN PLAINTIFFS' FAVOR ....... 15

D.    THE PUBLIC INTEREST WOULD BE ADVANCED
      BY THE ISSUANCE OF THE REQUESTED INJUNCTION ........................................ 16

CONCLUSION ............................................................................................................. 17

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Baskin-Robbins, Inc. v. A. Ender, Ltd.*, No. CV-99-206-ECR, 1999 WL
1318498 (D. Nev. Sept. 10, 1999) ..............................................................................12, 14, 15, 16

*Burger King Corp. v. Stephens*, No. 89-7691,
1989 U.S. Dist. LEXIS 14527 (E.D. Pa. Dec. 6, 1989) ................................................................12

*C.B. Fleet Co., Inc. v. Complete Packaging Corp.*,
739 F. Supp. 393 (N.D. Ill. 1990) ................................................................................................13

*Days Inn of America, Inc.  v. Patel*, 88 F. Supp. 2d 928 (C.D. Ill. 2000) ....................................15

*Dunkin' Donuts Inc. v. Albireh Donuts, Inc.*,
96 F. Supp. 2d 146 (N.D.N.Y. 2000) ................................................................................11, 14, 15

*Dunkin' Donuts Inc. v. Kashi Enters., Inc.*,
106 F. Supp. 2d 1325 (N.D. Ga. 2000) ............................................................................11, 14, 15

*Dunkin' Donuts Inc. v. Priya Enters., Inc.*, 89 F. Supp. 2d 319 (E.D.N.Y. 2000) ......................14

*Frisch's Restaurants, Inc. v. Elby's Big Boy*, 670 F.2d 642 (6th Cir. 1982) .................................16

*International Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67 (2d Cir. 1996) ...............................11, 16

*McDonald's Corp. v. Robertson*, 147 F.3d 1301 (11th Cir. 1998) ................................................13

*Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*,
22 F.3d 546 (4th Cir. 1994) ..........................................................................................................12

*Planned Parenthood v. Citizens for Cmty. Action*, 558 F.2d 861 (8th Cir. 1977) .........................13

*S&R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371 (3d Cir. 1992) ..................................................12

*Shell Oil Co. v. Commercial Petroleum, Inc.*, 928 F.2d 104 (4th Cir. 1991) ................................13

*Warner Bros., Inc. v. Gay Toys, Inc.*, 658 F.2d 76 (2d Cir. 1981) ..........................................13, 16

*Warner-Lambert Co. v. Northside Dev. Corp.*, 86 F.3d 3 (2d Cir. 1996) .....................................13

## FEDERAL STATUTES

15 U.S.C. § 1065 .............................................................................................................................2

## <u>INTRODUCTION</u>

Plaintiff Dunkin' Donuts Franchised Restaurants LLC, DD IP Holder LLC (unless otherwise specified, Dunkin' Donuts Franchised Restaurants LLC and DD IP Holder LLC are collectively referred to hereinafter as "Dunkin' Donuts" or "Dunkin'"), Baskin-Robbins Franchise Shops LLC and BR IP Holder LLC (unless otherwise specified, Baskin-Robbins Franchise Shops LLC and BR IP Holder LLC and BR IP Holder LLC are collectively referred to hereinafter as "Baskin-Robbins") hereby move to enjoin their franchisees, Defendants KNZ 110th Lexington, LLC, KNZ 161Broadway Donut, LLC, and KNZ 149 Broadway Donut, LLC to cease violating at their Dunkin' Donuts and Baskin-Robbins shops the standards for health, sanitation, and safety set forth in Defendants' Franchise Agreements with Plaintiffs. At present, Defendants are in flagrant violation of those standards. For example, a recent inspection of Defendants' shops revealed numerous violations of health and safety standards, including evidence of pest (i.e. mouse droppings, dead roaches); equipment not properly cleaned including mold on equipment; paper liners exposed to various contamination; portion plates exposed to various contamination; food contact surfaces are not protected from contamination and allergens; food products not stored at proper temperature; food products not properly labeled; food products not properly dated; dirt and debris in ice; food products left exposed without a cover; sick employees preparing food for customers; equipment and utensils not being sanitized properly; and generally unclean and poorly maintained premises. Despite requests by Plaintiffs and ample opportunity to cure, Defendants refuse to correct this unacceptable situation. This is an action to effect an immediate cure of specific conditions currently posing a health or safety risk at Defendants'

shops.  These conditions constitute a material breach of the Franchise Agreements as well.

Plaintiffs do not seek an order mandating future compliance, but only the cessation of an existing

condition.

As discussed *infra*, a preliminary injunction is warranted in this case because Plaintiffs

are likely to succeed on the merits and will continue to suffer irreparable harm to the goodwill

associated with its trademarks and trade name if injunctive relief is not granted.  Furthermore,

the balance of harms tips decisively in Plaintiffs' favor, and the public interest would be served

by granting the injunction.  No adequate remedy at law exists.

## FACTUAL BACKGROUND

### Dunkin' Donuts

1.    Dunkin' Donuts is engaged in the business of franchising independent business

persons to operate Dunkin' Donuts shops throughout the United States.  (Laudermilk Cert., Ex.

1, ¶ 3.)  Dunkin' Donuts franchisees are licensed to use the trade names, service marks, and

trademarks of Dunkin' Donuts and to operate under the Dunkin' Donuts system, which involves

the production, merchandising, and sale of doughnuts and related products utilizing a specially

designed building with special equipment, equipment layouts, interior and exterior accessories,

identification schemes, products, management programs, standards, specifications, proprietary

marks, and information.  *Id*.

2.    Dunkin' is the franchisor of the Dunkin' Donuts franchise system.  *Id*. ¶ 4.

3.    DD IP Holder LLC, is the owner of the trademark, service mark, and trade name

"Dunkin' Donuts," and related marks.  Dunkin' Donuts has the exclusive license to use and

license others to use these marks and trade name and has used them continuously since

approximately 1960 to identify its doughnut shops, and the doughnuts, pastries, coffee, and other products associated with those shops. *Id.* ¶ 5.

4.     DD IP Holder LLC owns numerous federal registrations for the mark Dunkin' Donuts, and related marks. Among those registrations are Registration Nos. 748,901, 1,148,165, and 1,159,354. Each of these registrations is in full force and effect, and is incontestable, pursuant to 15 U.S.C. § 1065. *Id.* ¶ 6.

5.     The Dunkin' Donuts marks have been very widely advertised and promoted by Dunkin' Donuts over the years. Dunkin' Donuts and its franchisees have expended approximately $875,000,000 in advertising and promoting the Dunkin' Donuts marks over the last twenty-nine years. Dunkin' Donuts spent approximately $94,000,000 in fiscal year 2000 alone on advertising and promotion. *Id.* ¶ 7.

6.     Dunkin' Donuts and its franchisees currently operate approximately 4,100 shops in the United States and approximately 1,800 shops outside of the United States. Dunkin' Donuts shops feature Dunkin' Donuts' distinctive trade dress, including the pink and orange color scheme, and the frankfurter lettering style. In the more than forty years since the Dunkin' Donuts system began, millions of consumers have been served in Dunkin' Donuts shops. *Id.* ¶ 8.

7.     As a result of the extensive sales, advertising, and promotion of items identified by the Dunkin' Donuts marks, the public has come to know and recognize the Dunkin' Donuts marks, and to associate them exclusively with products and services offered by Dunkin' Donuts and its franchisees. The Dunkin' Donuts marks are among the best and most widely known trademarks in the United States today, and are assets of inestimable value to Dunkin' Donuts, representing and embodying Dunkin' Donuts' considerable goodwill and favorable reputation. *Id.* ¶ 9.

8.      The goodwill and reputation associated with the Dunkin' Donuts mark are impaired when a franchisee fails to maintain standards and operates an unsanitary or unclean business under the Dunkin' Donuts trademarks.  *Id.* ¶ 10.  For example, in the fall of 1995, the nationally broadcast television program *Prime Time Live* did an exposé on standards violations in quick service restaurants.  *Id.* ¶ 11.  Employees at two Dunkin' franchises with poor standards were shown on hidden camera displaying improper hygiene and food preparation techniques. *Id.*  The two franchisees responsible are no longer in the Dunkin' Donuts system.  *Id.* Previously, WWOR in New Jersey did a televised exposé on a Dunkin' shop, accusing it of numerous standards violations.  *Id.*  The type of negative publicity suffered as a result of these incidents can endanger Dunkin's long established reputation and goodwill.  *Id.*

### Baskin-Robbins

9.      Baskin-Robbins is engaged in the business of franchising independent business persons to operate Baskin-Robbins stores throughout the United States. *Id.* ¶ 12.  Baskin-Robbins franchisees are licensed to use the trade names, service marks, and trademarks of Baskin-Robbins and to operate under the Baskin-Robbins system, which involves the production, merchandising, and sale of ice cream and related products utilizing special equipment, equipment layouts, interior and exterior accessories, identification schemes, products, management programs, standards, specifications, proprietary marks, and information. *Id.*

10.     Baskin-Robbins is the franchisor of the Baskin-Robbins System. *Id.* ¶ 13.

11.     BR IP Holder LLC is the owner of the trademark, service mark, and trade name "Baskin-Robbins" and related marks.  Baskin-Robbins has the exclusive license to use and license others to use these trademarks and trade names and has used them continuously since

approximately 1950 to identify its ice cream stores, and the ice cream and other products associated with those stores.  *Id.* ¶ 14.

12.    BR IP Holder LLC owns numerous federal registrations for the mark "Baskin-Robbins" and related marks.  *Id.* ¶ 15.

13.    The Baskin-Robbins marks have been very widely advertised and promoted by Baskin-Robbins over the years.  Baskin-Robbins has expended tens of millions of dollars in advertising and promoting the Baskin-Robbins marks over the past fifty years.  *Id.* ¶ 16.  As a result, the Baskin-Robbins marks have become famous throughout the United States.  *Id.*

14.    Baskin-Robbins and its franchisees currently operate approximately 2,200 stores in the United States and 2,600 stores outside of the United States.  *Id.* ¶ 17.  In the more than fifty years since the Baskin-Robbins system began, millions of consumers have been served in Baskin-Robbins stores.  *Id.*

15.    As a result of the extensive sales, advertising, and promotion of items identified by the Baskin-Robbins marks, the public has come to know and recognize the Baskin-Robbins marks, and to associate them exclusively with products and services offered by Baskin-Robbins and its franchisees.  *Id.* ¶ 18.  The Baskin-Robbins marks are among the best and most widely known trademarks in the United States today, and are assets of inestimable value to Baskin-Robbins, representing and embodying Baskin-Robbins' considerable goodwill and favorable reputation.  *Id.*

16.    The goodwill and reputation associated with the Baskin-Robbins trademarks and trade names are impaired when a franchisee fails to maintain standards and operates an unsanitary or unclean business under the Baskin-Robbins trademarks.  *Id.* ¶ 19.

17.     Defendant KNZ 110th Lexington, LLC is a Dunkin' Donuts franchisee for a doughnut shop located at 1773 Lexington Avenue, New York, New York 10029 ("Lexington Avenue Shop") pursuant to a Franchise Agreement dated May 29, 2003 (the "Lexington Avenue Agreement").  Defendant is licensed to use Dunkin' Donuts' trademarks, trade name, and trade dress.  *Id.* ¶ 20.

18.     Defendant KNZ 161Broadway Donut, LLC is a Dunkin' Donuts and Baskin-Robbins franchisee for a doughnut shop and ice cream store located at 3851 Broadway, New York, New York 10032 ("3851 Broadway Shop") pursuant to a Franchise Agreement dated November 23, 2004 (the "3851 Broadway Agreement").  Defendants is licensed to use Dunkin' Donuts' and Baskin-Robbins trademarks, trade name, and trade dress.  *Id.* ¶ 21.

19.     Defendant KNZ 149 Broadway Donut, LLC is a Dunkin' Donuts and Baskin-Robbins franchisees for a doughnut shop and ice cream store located at 3600 Broadway, New York, New York 10031 ("3600 Broadway Shop") pursuant to a Franchise Agreement dated April 6, 2005 (the "3600 Broadway Agreement").  Defendants is licensed to use Dunkin' Donuts' and Baskin-Robbins trademarks, trade name, and trade dress.  *Id.* ¶ 22.

### **Dunkin' Manuals**

20.     Dunkin' provides each of its franchisees a set of manuals and guidelines (collectively referred to hereinafter as the "Dunkin' Manuals") which set forth in detail the procedures, methodology and standards applicable to the operation of a Dunkin' shop.  These documents include:

a.     The Network Administration Manual, which includes detailed sections on Operations Assessment for Customer Satisfaction (Chapter 5), Building and Site Maintenance (Chapter 11), Sanitation (Chapter 13), and Standards (Chapter 14):

b.     The Production and Distribution Manual, which includes detailed sections on Cleaning, Sanitizing and Maintaining Production Area Equipment (Chapter 1) and the production and handling of food products;

c.     The Customer Service Manual, which includes detailed sections on Receiving and Storing Raw Materials (Chapter 1), Service Procedures (Chapter 3), Procedure for Brewing and Serving Coffee (Chapter 4), Heating and Serving Bakery Products (Chapter 6), Making and Serving Sandwiches (Chapter 7), Procedures for Preparing and Serving Soup (Chapter 8), and Cleaning, Sanitizing and Maintaining Sales Area Equipment (Chapter 9); and

d.     The Retail Food Safety System Manual.

*Id*. ¶ 23.

## **Baskin-Robbins Manuals**

21.     Baskin-Robbins provides each of its franchisees manuals, rules, and plans (collectively referred to hereinafter as the "Baskin Manuals") which set forth in detail the procedures, methodology, and standards applicable to the operation of a Baskin-Robbins store. These documents include:

a.     The Store Operations and Management Guide, which includes detailed sections on Dress Standards (Chapter 205.1), Cleanliness and Store Appearance (Chapters 300.1-303.1), Ice Cream Product Handling (Chapter 604.1), Yogurt Product Handling (Chapter 609.1), Product Preparation (Chapters 700.1-704.1), Sanitation and Maintenance (Chapters 1100.1-1108.1), and Safety (Chapter 1207.1);

b.     The Rules of Operation of a Baskin-Robbins Store; and

c.     The Retail Food Safety System Manual.

*Id.* ¶ 24.

20.    Taken together, the Dunkin' and Baskin Manuals provide detailed and specific guidance and standards for health, sanitation, and safety.  *Id*. ¶ 23.

## Franchise Agreements

21.    The Franchise Agreements executed by Defendants contain acknowledgments and agreements by Defendants concerning the importance of maintaining Plaintiffs' standards for health, sanitation, and safety.  For example, the applicable paragraphs of the Franchise Agreements include:

>    a.    Section 5.0 and 5.1:  FRANCHISEE understands and acknowledges the importance to FRANCHISOR, FRANCHISEE and other franchisees, of FRANCHISEE's commitment to at all times operate the Unit in accordance with FRANCHISOR's Standards (as defined in Definitions paragraph "I"), in order to increase the demand for FRANCHISOR's products, to protect and enhance the repuration and goodwill of FRANCHISOR, to promote and protect the value of the Proprietary Marks and other reasons . . .  FRANCHISEE further agrees as follows:

>    b.    Section 5.1.1:  To use all products, materials, ingredients, supplies, paper goods, uniforms, fixtures, furnishings, signs, equipment, methods of exterior and interior design and construction and methods of product storage, handling, preparation, packaging, delivery and sale prescribed by FRNAHCISOR. All such items must conform to FRANCHISOR's Standards.  FRANCHISOR reserves the right to specify any item by brand.  FRANCHISEE shall carry out the business covered by this Agreement in accordance with the operational Standards established by FRANCHISOR and set forth in FRANCHISOR's operating manuals and other documents as they presently exist or shall exist in the future or as my be otherwise disclosed to franchisee from time to time.

>    c.    Section 5.1.6:  FRANCHISEE shall maintain, at all times and at FRANCHISEE's expense, the interior and exterior of the Unit and all fixtures, furnishings, signs and equipment in the highest degree of cleanliness, orderliness, sanitation and repair, as reasonably required by FRANCHISOR. . . .

Ex. 1C, D, and E §§ 5.0, 5.1, 5.1.1., and 5.1.6.

22.    The Franchise Agreements also contains acknowledgments and agreements concerning the use of Dunkin' Donuts' and Baskin-Robbins proprietary marks.  The relevant sections include:

      a.     Sections DD-7 7.0 and 7.1:  FRANCHISEE acknowledges and agrees that DUNKIN' DONUTS® is a registered trademark owned or controlled by DUNKIN' DONUTS; that said mark has been and is being used by DUNKIN' DONUTS and by its franchisees and licensees; that said mark, together with the other Proprietary Marks presently owned by Dunkin' Donuts System; that valuable goodwill is associated with and attached to said mark and the other Dunkin' Donuts Proprietary Marks; and that any and all goodwill associated with the Dunkin' Donuts Proprietary Marks, including any goodwill which might be deemed to have arisen through FRANCHISEE activities, inures directly and exclusively to the benefit of DUNKIN' DONUTS. . . . FRANCHISEE agrees to use the Proprietary Marks only in the manner and to the extent specifically licensed by this Agreement.

      b.     Sections 8.0 and 8.0.1:  [N]either FRANCHISEE, nor any partner, officer, director, shareholder or member of FRANCHISEE, as the case may be, shall . . . do or perform, directly or indirectly, any . . . act injurious or prejudicial to the goodwill associated with FRANCHISOR's Proprietary Marks and the System(s).

Ex. 1C, D, and E §§ DD-7 7.0, 7.1, 8.0 and 8.0.1.

(Section BR-7 7.0.1 is substantially identical to Section DD-7 7.0)

    23.     The Franchise Agreement (at Section 9.3) provides that Defendants shall pay to Plaintiffs all damages, costs and expenses, including attorneys' fees, incurred by Plaintiffs as a result of any breach of the Franchise Agreement by Defendants and Defendants' failure to cure said default following notice.

    24.     On March 26, 2007, the Lexington Avenue Shop was inspected by a Dunkin' representative.  (Matlovsky Cert., Ex. 2, ¶ 4)  Numerous standards violations were identified relating to health, sanitation, and safety.  *Id.*  On March 26, 2007, the Dunkin' representative hand-delivered to the Lexington Avenue Shop a notice to cure listing the standards violations present at the Lexington Avenue Shop and requesting that the violations be cured immediately.  *Id.* ¶ 5.  On April 2, 2007, the Dunkin' representative reinspected Defendants' Shop.  *Id.* ¶ 6.  Numerous standards violations remained uncured.  *Id.*

25.     On March 26, 2007, the 3851 Broadway Shop was inspected by Plaintiffs' representative. *Id.* ¶ 7.  Numerous standards violations were identified relating to health, sanitation, and safety.  *Id.*  On March 26, 2007, Plaintiffs' representative hand-delivered to the 3851 Broadway Shop a notice to cure listing the standards violations present at the 3851 Broadway Shop and requesting that the violations be cured immediately.  *Id.* ¶ 8.  On April 5, 2007, Plaintiffs' representative reinspected Defendants' Shop.  *Id.* ¶ 9.  Numerous standards violations remained uncured.  *Id.*

26.     On March 26, 2007, the 3600 Broadway Shop was inspected by Plaintiffs' representative. *Id.* ¶ 10.  Numerous standards violations were identified relating to health, sanitation, and safety.  *Id.*  On March 26, 2007, Plaintiffs' representative hand-delivered to the 3600 Broadway Shop a notice to cure listing the standards violations present at the 33600 Broadway Shop and requesting that the violations be cured immediately.  *Id.* ¶ 11.  On April 5, 2007, Plaintiffs' representative reinspected Defendants' Shop.  *Id.* ¶ 12.  Numerous standards violations remained uncured.  *Id.*

## **ARGUMENT**

The grant or denial of a preliminary injunction rests in the sound discretion of the trial court.  The factors a court considers in whether to grant a preliminary injunction are well established:

> (1)     whether the plaintiff will suffer irreparable injury if the injunction is not granted; and either
>
> (2)     whether there is a substantial likelihood that the plaintiff will succeed on the merits; *or*
>
> (3)     whether sufficiently serious questions going to the merits exist to make them fair grounds for litigation and a balance of hardships weighs decisively toward the party requesting the injunction.

*See International Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 70 (2d Cir. 1996).  An examination

of these factors demonstrates that Plaintiffs are entitled to a preliminary injunction.

**A.    THE DEPLORABLE CONDITION OF DEFENDANTS' SHOPS
        HAS CAUSED AND CONTINUES TO CAUSE IRREPARABLE
        INJURY TO PLAINTIFFS' REPUTATION AND GOODWILL
        FOR WHICH NO ADEQUATE REMEDY AT LAW EXISTS.**

Several United States District Courts have held that a Dunkin' franchisee's violation of

the identical health, sanitation, and safety standards at issue here constituted irreparable injury

warranting a preliminary injunction:

> The possibility of irreparable injury arises because the record evidence indicates
> that the unsanitary conditions at the defendant's store may result in illness to the
> plaintiff's customers.  To this end, the court notes that the plaintiff has an
> important interest in the uniformity of food specifications, preparation methods,
> quality and appearance, [and] facilities and service of its franchisees.  No[t] only
> does the defendant's conduct place the plaintiff's trademarks and trade name at
> risk, but more importantly, it puts the public in danger of food contamination.
> Further, the plaintiff has a strong legal interest in avoiding disputes stemming
> from the cleanliness and safety of its products.  Accordingly, if customers become
> ill due to the defendant's franchises' unsanitary conditions, the plaintiff's national
> reputation, goodwill, and business will be harmed.

*Dunkin' Donuts Inc. v. Kashi Enters.*, *Inc*., 106 F. Supp. 2d 1325, 1327 (N.D. Ga. 2000)

(citations omitted).  *See also Dunkin' Donuts Inc. v. Albireh Donuts, Inc*., 96 F. Supp. 2d 146,

149 (N.D.N.Y. 2000) ("[T]he serving of inferior, non-conforming products under [Dunkin's]

name could have a detrimental impact on [Dunkin's] name and goodwill, devalue [Dunkin's]

trademark, and subject [Dunkin'] to a loss of business and exposure to substantial tort liability.

The courts have repeatedly held that such damage is not readily quantifiable and, thus,

constitutes irreparable harm.").

Similarly, under virtually identical circumstances, another United States District Court

held that a franchisee's violation of the franchisor's standards for health, sanitation, and safety

constituted irreparable injury warranting a preliminary injunction:

11

> The evidence shows that there is a threat of irreparable injury to plaintiff if the injunction is not granted.  The possibility of irreparable injury arises because the evidence shows that unsanitary conditions at defendant's store may result in illness of Baskin-Robbins' customers.  The potential of infection of customers because of e-coli or other dangerous ailments . . . from unsanitary conditions at the store is considerable.  If such were to occur, certainly the reputation, goodwill and business of Baskin-Robbins at large in the country would be harmed.  This constitutes irreparable injury.

*Baskin-Robbins, Inc. v. A. Ender, Ltd.,* No. CV-N-99-206-ECR, 1999 WL 1318498, at *3 (D. Nev. Sept. 10, 1999) (granting the identical injunctive relief sought here) (attached hereto as Exhibit 3).

This decision follows the well-established principle that a franchisor lacks control over its trademarks when a franchisee fails to operate its shop in compliance with established standards:

> The public's knowledge of the uniformity of operation and quality of product draws business to Burger King restaurants.  Therefore, the name "Burger King" constitutes a trademark of great value to BKC and to the franchisees.  BKC's inability to protect and insure the maintenance of the high quality of service that the marks represent would cause irreparable injury to BKC's business reputation and goodwill.

> If BKC is unable to control the nature and quality of the goods and services defendants provide at Burger King franchised restaurants, *activities not meeting BKC standards at those restaurants could irreparably harm the goodwill associated with BKC's marks and BKC's reputation*.  Moreover, failure to meet some of the safety and sanitary standards here involved could subject BKC to substantial civil liability to members of the public personally injured thereby.

*Burger King Corp. v. Stephens*, No. 89-7691, 1989 U.S. Dist. LEXIS 14527, at *26-27 (E.D. Pa. Dec. 6, 1989) (emphasis added) (granting injunction requiring franchisees to comply with franchisor's quality control standards) (attached hereto as Exhibit 4).

Courts have consistently found that injury to reputation or goodwill is not easily measured in monetary terms, and is thus deemed irreparable.  *See S&R Corp. v. Jiffy Lube Int'l, Inc.,* 968 F.2d 371, 378 (3d Cir. 1992) ("Grounds for irreparable injury include loss of control of reputation, loss of trade, and loss of goodwill."); *Multi-Channel TV Cable Co. v. Charlottesville*

*Quality Cable Operating Co.*, 22 F.3d 546, 552 (4th Cir. 1994) ("[W]hen the failure to grant preliminary relief creates the possibility of . . . the loss of goodwill, the irreparable injury prong is satisfied"); *Planned Parenthood v. Citizens for Cmty. Action*, 558 F.2d 861, 867 (8th Cir. 1977) (finding that goodwill imperiled by defendant's actions constitutes irreparable injury).

In trademark infringement cases, courts have issued injunctions similar to the one sought here. For example, in *Warner-Lambert Co. v. Northside Dev. Corp.*, 86 F.3d 3 (2d Cir. 1996), the manufacturer of cough drops, Warner-Lambert, brought a trademark infringement action against its licensee for selling cough drops that did not comply with Warner-Lambert's quality control standards. The Second Circuit granted an injunction prohibiting the sale of the non-conforming products. *Id.* at 6-8. In holding that the injunction was warranted, the court stated:

> A company that avails itself of wholly effective [quality control] procedures will generally be entitled to relief against any measurable sales of non-conforming goods. Sales of non-conforming goods will in those circumstances place poor quality goods where none were before and necessarily devalue the mark associated with them.

*Id.* at 7. *See also Shell Oil Co. v. Commercial Petroleum, Inc.*, 928 F.2d 104, 107 (4th Cir. 1991) (affirming injunction against the sale of products that did not meet trademark holder's quality control standards); *C.B. Fleet Co., Inc. v. Complete Packaging Corp.,* 739 F. Supp. 393, 398-99 (N.D. Ill. 1990) (same).

Not only does Defendants' conduct put the franchisors' trademarks and trade name at risk, but more importantly, it endangers the public's health. *See McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1309 (11th Cir. 1998) ("[I]t is difficult for the court to conceive of substantially more serious violations than those that could jeopardize the health of [the franchisee's] patrons . . . .").

13

Plaintiffs have invested a tremendous amount of resources over the years in building the considerable goodwill associated with their marks.  Customers have grown to expect high standards for health, sanitation, and safety from Plaintiffs franchises.  Defendants' conduct has injured and continues to injure that hard earned reputation and associated goodwill.  Accordingly, ample justification exists for the finding of irreparable injury to Plaintiffs.

**B.**    **PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.**

The record demonstrates that Defendants have breached the Franchise Agreement.  The Dunkin' Manuals, Baskin Manuals and the Franchise Agreements spell out clearly Defendants' obligation to operate clean and safe shops.  As the documents and photographs make clear, standards violations were observed at Defendants' Shops, Notices to Cure were delivered, and, after the opportunity to cure expired, Defendants failed to cure the violations.  Other federal courts have found that such circumstances constitute a clear breach of the Franchise Agreement.  *See Kashi Enters.*, *Inc*., 106 F. Supp. 2d at 1327 ("[T]he record includes numerous documents, affidavits, and photographs, which demonstrate that the defendant has failed to cure the alleged violations.  Accordingly, the court finds that the plaintiff is likely to succeed in its action to enjoin the defendant from violating the Franchise Agreement standards. . . ."); *Albireh Donuts, Inc*., 96 F. Supp. 2d at 150 (based on similar  evidence the court found that it was "likely that [Dunkin'] will succeed on its breach of contract claim"); *A. Ender, Ltd.,* 1999 WL 1318498, at *2-3 (court held that the franchisor was likely to succeed on its breach of contract claim based on evidence that the franchisee violated almost the identical health and safety standards as those at issue here) (Ex. 3).  *See also Dunkin' Donuts Inc. v. Priya Enters., Inc.*, 89 F. Supp. 2d 319, 323 (E.D.N.Y. 2000) (granting summary judgment for Dunkin' and holding that the violations present at the franchisee's shops "unquestionably amount to serious breaches of . . . the franchise

agreement."); *Days Inn of America, Inc. v. Patel*, 88 F. Supp. 2d 928, 932-33 (C.D. Ill. 2000)

(granting summary judgment on franchisor's breach of contract claim on the grounds that the

franchisee failed to comply with franchisor's standards). Such conduct also constitutes a

violation of the Lanham Act. *See Kashi Enters., Inc.*, 106 F. Supp. 2d at 1327; *Albireh Donuts,*

*Inc.*, 96 F. Supp. 2d at 150-51 (citing *Northside Dev. Corp.,* 86 F.3d at 5-8). Accordingly,

Plaintiffs are very likely to succeed on the merits.

## C.    THE BALANCE OF HARM WEIGHS DECISIVELY IN PLAINTIFFS' FAVOR.

Defendants can offer no reasonable justification for their conduct. Issuance of the

preliminary injunction would simply require Defendants to comply with the requirements to

which their freely agreed in signing the Franchise Agreements. Consequently, no harm will

come to Defendants in granting the injunction, and, ironically, their business will likely increase

due to the improved condition of the shops. In contrast, Defendants' conduct threatens the

reputation and goodwill of Plaintiffs, which extends to each of its franchisees. In *Kashi Enters.,*

*Inc.,* the Court noted that the balance of hardships tipped in the franchisor's favor:

> The instant injunction would only require that the defendant comply with the
> Franchise Agreement, [into] which it freely entered. While no harm would befall
> the defendant by its compliance with the sanitation standards, the court notes that
> its business and public safety would at worst improve. Accordingly, the court
> finds that threatened injury to the plaintiff outweighs any conceivable injury to the
> defendant.

106 F. Supp. 2d at 1327. *See also Albireh Donuts, Inc.*, 96 F. Supp. 2d at 151 ("[T]he balance of

hardships decidedly tip[s] in favor of [Dunkin'] in light of the dangers posed to the public and

[Dunkin's] name and goodwill and the insubstantial burden that would be imposed upon

Defendants by requiring them to comply with their obligations under the franchise agreement.").

Similarly, the court held in *A. Ender, Ltd.*:

> As contrasted with the cost to [the franchisee] of curing these deficiencies, the outbreak of salmonella or some other disease or infection which may be visited upon the customers of the store, as a result of conditions at the store, tip the hardships in favor of plaintiff, because those risks and those problems are very serious and may have even a national impact on Baskin-Robbins.

1999 WL 1318498, at *3. (Ex. 3.)

Licensed franchisees have placed their trust in the franchisor to protect their substantial investment in the system. *See Frisch's Restaurants, Inc. v. Elby's Big Boy,* 670 F.2d 642, 651 (6th Cir. 1982); *Warner Bros., Inc. v. Gay Toys, Inc.,* 658 F.2d 76, 79 (2d Cir. 1981) ("If the injunction is denied, . . . [the franchisor's] licensing program will lose much of the confidence reposed in it by the licensees, who also made substantial investments based upon the exclusivity of their licenses."). The balance of harms weighs decisively in Plaintiffs' favor.

**D.    THE PUBLIC INTEREST WOULD BE ADVANCED BY THE ISSUANCE OF THE REQUESTED INJUNCTION.**

Although not a factor in the Second Circuit's test for whether injunctive relief should issue, *see Amestoy,* 92 F.3d at 70, little doubt exists that the requested preliminary injunction would advance the public interest. It is axiomatic that the public has a right to a clean and safe environment where food is prepared and sold. Granting the requested preliminary injunction would do no more than require Defendants to create such an environment at their shop. *See A. Ender, Ltd.,* 1999 WL 1318498, at *3 ("The public health aspects of the evidence show that the public interest favors the granting of the injunction") (Ex. 3). Moreover, the public has an interest in requiring parties to honor their obligations under contracts into which they freely enter. Here, Defendants are clearly breaching the Franchise Agreement and endangering the health of their customers.

\* \* \*

In sum, the factors the court examines for issuance of a preliminary injunction are more than satisfied by Plaintiffs here.  Plaintiffs have been and continues to be irreparably injured by Defendants' conduct, Plaintiffs are likely to succeed on the merits, the balance of the equities weighs decisively in Plaintiffs' favor, and the public interest would be protected by the issuance of an injunction.  Plaintiffs have no adequate remedy at law.  Accordingly, Plaintiffs' Motion for a Preliminary Injunction should be granted.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their Motion for a Preliminary Injunction.

Respectfully submitted,


/s/ Ronald D. Degen_____
Ronald D. Degen, Esq.  (RD 7808)
Scott Goldfinger, Esq.  (SG 9219)
O'ROURKE & DEGEN, PLLC
225 Broadway, Suite 715
New York, New York 10007
Telephone:     (212) 227-4530
Facsimile:     (212) 385-9813
E-mail:          rdegen@odlegal.com

Robert L. Zisk (RZ 1275)
David E. Worthen (DW 8519)
GRAY, PLANT, MOOTY, MOOTY
& BENNETT, P.A.
2600 Virginia Avenue, N.W.
Suite 1111
Washington, DC 20037
Telephone:     (202) 295-2200
Facsimile:     (202) 295-2250

Collin B. Foulds (CF 5656)
GRAY, PLANT, MOOTY, MOOTY
& BENNETT, P.A.
500 IDS Center
80 South Eighth Street
Minneapolis, Minnesota 55402
Telephone:     (612) 632-3388
Facsimile:     (612) 632-4388

*Attorneys for Plaintiffs*
Dunkin' Donuts Franchised Restaurants LLC,
DD IP Holder LLC,
Baskin-Robbins Franchised Shops LLC, and
BR IP Holder LLC.

Dated: May 11, 2007