SDA # 339076

PC # 339380
New York, NY

## FRANCHISE AGREEMENT
### ALLIED DOMECQ QUICK SERVICE RESTAURANTS

This Franchise Agreement is dated $\underline{\hspace{0.5cm}}$ May 21 $\underline{\hspace{0.5cm}}$, 2003, and made by and between **DUNKIN' DONUTS INCORPORATED** (hereinafter "DUNKIN' DONUTS"), a Delaware corporation with principal offices in Randolph, Massachusetts (such corporations are hereinafter individually or collectively referred to as "FRANCHISOR") and the following individual(s) and/or entity:

$\underline{\hspace{1cm}}$ **KNZ 110TH LEXINGTON, LLC, a New York limited liability company** $\underline{\hspace{1cm}}$
(hereinafter individually or collectively referred to as "FRANCHISEE")

This Franchise Agreement includes the Contract Data Schedule, General Terms and Conditions designated as ("ADQSR-120102") and the Special Terms and Conditions identified in Item "J" of the Contract Data Schedule below.

## CONTRACT DATA SCHEDULE

A.   Location of the Franchised Unit (the "Premises"):

| 1773 | Lexington Avenue | New York | New York | 10029 |
|---|---|---|---|---|
| (number) | (street) | (city or town) | (state) | (zip code) |

B.   Term: .........................Twenty (20) years from the first date the Unit opens to serve the general public.

C.   Initial Franchise Fee: ................................................................Fifty Thousand dollars ($ 50,000.00) *
*Paid under SDA# 339076 ($50,000.00)

D.   Marketing Start-Up Fee: .......................................................Five Thousand dollars ($ 5,000.00)

E.   Continuing Franchise Fee Rate: ......................Five and Nine-tenths percent (5.9%) of Gross Sales

F.   Minimum Continuing Advertising Fee Rate: ..............................Five percent ( 5.0%) of Gross Sales

G.   Refurbishment Date:   In the case of a new unit, the date **five (5) years** and **fifteen (15) years** after the first date the Unit opens to serve the general public.
     Remodel Date:   In the case of a new unit, the date **ten (10) years** after the first date the Unit opens to serve the general public.

H.   Transfer Fee:  As provided in subsection 10.4 of the General Terms and Conditions, unless another amount is inserted here: $\underline{\hspace{1cm}}$ **No Change** $\underline{\hspace{1cm}}$

I.   Address for notice to FRANCHISEE shall be at the Unit Premises, unless another address is inserted here: $\underline{\hspace{3cm}}$

J.   Special Terms and Conditions:   [ X ]  DD00 – Special Terms and Conditions Applicable to a Dunkin Donut Franchise

     [ X ]  FD – Special Terms and Conditions Applicable to Development of a New Unit by Franchisee

     [ X ]  NY Addendum To The ASQSR Franchise Agreement And Store Development Agreement Required By the New York General Business Law

K.   The Designated Representative for this Unit is $\underline{\hspace{3cm}}$
     *[print full name above]*
     *(List only one person. See definitions in General Terms and Conditions.)*

L.   Arbitration under this Agreement shall be initiated in the city and state of $\underline{\hspace{1cm}}$ **New York** $\underline{\hspace{1cm}}$.

M.   If applicable, the "Producing Unit" for this Dunkin' Donuts Unit is the Dunkin' Donuts manufacturing unit located at **PC# 336078 – 1430 Route 46 East – Fort Lee, New Jersey 07024**

Form last revised 12/01/02

ADQSR-120102

# ALLIED-DOMECQ QUICK SERVICE RESTAURANTS FRANCHISE AGREEMENT

© December, 2002

## GENERAL TERMS AND CONDITIONS

### INTRODUCTION

**Baskin-Robbins USA Co.,** a California corporation ("BASKIN-ROBBINS"), **Dunkin' Donuts Incorporated**, a Delaware corporation ("DUNKIN' DONUTS") and **Togo's Eateries Inc.**, a California corporation ("TOGO'S") are indirect wholly-owned subsidiaries of Allied Domecq PLC, a publicly-traded United Kingdom company. To take advantage of synergies between them, the three subsidiaries share certain common field and support personnel and form an unincorporated division called "Allied Domecq Quick Service Restaurants". As a result of the expenditure of time, effort and money, each subsidiary has acquired experience and skill in the development and operation of food service establishments using distinctive systems and techniques for the production, distribution, merchandising and sale of branded food products, including, without limitation, *Baskin-Robbins®* ice cream, yogurt and novelties, *Dunkin' Donuts®* donuts, coffee and freshly baked goods, *Togo's®* fresh sandwiches, salads and deli platters, and other unique and distinctive products, services and business methods (hereinafter each called a "System" and collectively called the "Systems").

The distinguishing characteristics of these Systems include, without limitation, distinctive exterior and interior design, decor, color and identification schemes and furnishings; specially designed manufacturing and merchandising equipment; unique and proprietary information technologies and software; special menu items; standards, specifications and procedures for operations, manufacturing, distribution and delivery; quality of products and services offered; management programs; training and assistance; and marketing, advertising and promotional programs, all of which may be changed, supplemented, improved and further developed from time to time by FRANCHISOR as new learning and best practices are identified and incorporated.

### DEFINITIONS

As used throughout this Agreement, the following defined terms shall have the following meanings:

A.    The "Proprietary Marks" are certain proprietary interests, trademarks, service marks, logos, emblems, trade dress and other indicia of origin and trade names, which identify for the public the source of goods and services marketed thereunder and represent to the public high and uniform standards of quality, cleanliness, appearance and service, including, without limitation, *Dunkin' Donuts®* owned or controlled by DUNKIN' DONUTS, *Baskin 31 Robbins®* owned or controlled by Baskin-Robbins Incorporated ("BRI"), and *TOGO'S®* owned or controlled by TOGO'S, all of which are registered trademarks on the Principal Register of the United States Patent and Trademark Office.

B.    "FRANCHISOR" refers to Dunkin' Donuts Incorporated with respect to the Dunkin' Donuts System, Baskin-Robbins USA, Co., with respect to the Baskin-Robbins System and Togo's Eateries, Inc. with respect to the Togo's System.

C.    "FRANCHISEE" means the person(s) or entity who signed this Agreement, which may include a sole proprietor, all partners of a general partnership, a corporation or a limited liability company ("LLC"). No person or entity may claim an interest in this Agreement or any Franchise granted hereby without FRANCHISOR's prior written approval.

D.    The "Unit" means the branded food service establishment, including the fixtures, furnishings, equipment, inventory and supplies located therein and/or attached thereto, operated by FRANCHISEE pursuant to this Agreement. If this Agreement authorizes more than one brand, the term "Unit" shall refer to all branded operations authorized hereby, unless such reference is expressly limited to any one brand.

E.    The "Premises" means the land and building or the area within a building, as the case may be, which is (i) approved by FRANCHISOR, (ii) dedicated to the operation of the Unit, and (iii) in the exclusive possession and control of FRANCHISEE. Some portion of the Premises may be under shared possession or control, if approved by FRANCHISOR.

F.    The term "Lease" means the document by which FRANCHISEE occupies and controls the Premises, whether the landlord is a third-party or FRANCHISOR, or one of its subsidiaries or affiliates.

G.    "Gross Sales" means and includes all revenue from the sale of all products and services and all other income of every kind and nature related to the Unit, whether for cash, by redemption of gift certificates or for credit, regardless of collection; provided, however, "Gross Sales" does not include the incidental sales of gift certificates or newspapers, incidental receipts from pay telephones, or any sales taxes or other taxes FRANCHISEE collects from customers for transmittal to the appropriate taxing authority.

H.    The "Designated Representative" is the person from time to time designated by FRANCHISEE as being responsible for the day-to-day operation of the Unit. The Designated Representative must meet FRANCHISOR's then-current qualifications, including, without limitation, successful completion of FRANCHISOR's training, and must be authorized to act for and bind FRANCHISEE in all dealings with FRANCHISOR with respect to the day-to-day operation of the Unit. The initial Designated Representative is identified in Item "K" of the Contract Data Schedule of this Agreement.

-2-

I.       The "Standards" are requirements, specifications, criteria, guidelines, processes, techniques and standards which are from time to time established and revised by FRANCHISOR with respect to selection and development of the Premises, operation of the Unit and other aspects of each System. Examples of "Standards" are, without limitation, requirements and criteria for developing the Unit; specifications for the facility, equipment and products; business processes and techniques for the operation of the Unit; and guidelines and standards for quality, cleanliness, appearance and service.

## Section 1. Grant of the Franchise and Term

1.0      This Agreement grants to FRANCHISEE the right, subject to all of the terms and conditions hereinafter set forth, to operate a Unit solely at the Premises described in Item "A" of the Contract Data Schedule of this Agreement, including the right to use, solely in such Unit, the System or Systems and Proprietary Marks described in the Special Terms and Conditions attached to and made a part of this Agreement (the "Franchise"). The term of this Agreement shall begin on the date hereof and shall end on the date described in Item "B" of the Contract Data Schedule; provided however, the Franchise shall commence upon the occurrence, of all of the following conditions prior to the initial opening of the Unit or the transfer of the Unit, as the case may be:

1.0.1    **Training.** FRANCHISEE and its Designated Representative must successfully complete the then-current training program required by FRANCHISOR at one or more of FRANCHISOR's training centers located in Massachusetts, California or at other locations from time to time designated by FRANCHISOR. This requirement may be waived or modified by FRANCHISOR, in whole or in part, in its sole discretion, if FRANCHISEE or its Designated Representative has had comparable training or on-the-job experience.

1.0.2    **Financing.** Upon request by FRANCHISOR, FRANCHISEE must deliver evidence to FRANCHISOR that FRANCHISEE has obtained binding commitments for all financing needed to develop and/or operate the Unit.

1.0.3    **Documents.** FRANCHISEE must execute and deliver to FRANCHISOR all documents related to this Franchise customarily required, in then-current form, as provided by FRANCHISOR.

1.0.4    **Payment.** FRANCHISEE must, prior to opening or transferring the Unit (as the case may be) pay FRANCHISOR any and all moneys due, including, but not limited to, purchase price, fees, inventory, rent and/or security deposit, if required under the Lease.

1.0.5    **Possession.** FRANCHISEE must have the exclusive right to occupy and use the Premises for at least the term of this Agreement, whether FRANCHISEE owns the Premises, or leases the Premises pursuant to either (a) a Lease with a third party landlord on terms satisfying FRANCHISOR's then current lease policy and containing provisions required by FRANCHISOR; or (b) a Lease with FRANCHISOR or an affiliated entity.

1.0.6    **For a New Unit.** If this Unit is newly developed, FRANCHISEE must, prior to the Unit's initial opening, comply with all provisions of the Special Terms & Conditions attached to this Agreement relating to new unit development (Schedule "F/D" or "C/D", as applicable).

1.1      The term of this Agreement shall expire without notice upon any earlier expiration or termination of a Lease, foreclosure of a mortgage, or other event which has the effect of terminating FRANCHISEE's possession and occupancy of the Unit.

1.2      FRANCHISEE represents and warrants that FRANCHISEE and each individual partner, member and/or shareholder of FRANCHISEE, as the case may be, is a United States citizen or a lawful resident alien of the United States; that, where applicable, the FRANCHISEE entity (corporation or LLC) is and shall remain duly organized and in good standing during the term of this Agreement; and that all financial and other information which FRANCHISEE has provided to FRANCHISOR in connection with FRANCHISEE's application for this Franchise is true and accurate. FRANCHISEE's representations and warranties under this paragraph 1.2 are a material inducement to FRANCHISOR's grant of the Franchise to FRANCHISEE.

## Section 2. Services Furnished by FRANCHISOR

2.0      FRANCHISOR agrees:

### 2.1      Prior to and For the Initial Opening of the Unit.

2.1.1    FRANCHISOR shall make available to FRANCHISEE Standards for the design, construction, equipping and operation of the Unit; and

2.1.2    FRANCHISOR shall make available to two individuals designated by FRANCHISEE, one of whom must be a party to or guarantor of this Agreement FRANCHISOR's then current initial training program with respect to the operation of the Unit, at one or more of FRANCHIISOR's Training Centers located in Massachusetts, California and/or at such other training facility as FRANCHISOR may, from time to time, designate; and

2.1.3    FRANCHISOR shall provide its current operating procedures to assist FRANCHISEE in complying with FRANCHISOR's Standards; and

2.1.4    FRANCHISOR shall make available to FRANCHISEE such assistance in the pre-opening, opening and initial operation of the Unit as FRANCHISOR shall deem advisable, based upon FRANCHISEE's organization, prior experience and training.

2.2    **After the Initial Opening of the Unit.**

2.2.1    FRANCHISOR shall maintain a continuing advisory relationship with FRANCHISEE, including consultation in the areas of marketing, merchandising and general business operations; and

2.2.2    FRANCHISOR shall provide FRANCHISEE with FRANCHISOR's Standards for the authorized System(s), as the same may be modified by FRANCHISOR from time to time, in its sole and absolute discretion; and

2.2.3    FRANCHISOR shall continue its efforts to maintain high and uniform standards of quality, cleanliness, appearance and service at all units; and

2.2.4    FRANCHISOR shall make reasonable efforts to disseminate FRANCHISOR's Standards to potential suppliers of products at the written request of FRANCHISEE, subject, however, to specific requirements and limitations of each authorized System.

## Section 3. Advertising and Promotion

3.0    FRANCHISOR has established and administers a marketing, advertising and sales promotion fund (the "Fund") for each of the Systems, and directs the development of all advertising, marketing and promotional programs for each System. FRANCHISOR has also established and administers a marketing, advertising and sales promotion fund for Stores that operate under all three (3) brands - the Dunkin' Donuts, Baskin-Robbins and Togo's brands ("TROMBO Stores") and certain stores that operate two (2) brands (certain "Combo Stores"). FRANCHISEE's payments to the Fund(s) shall be used for advertising, marketing, promotion, production and development of all advertising, marketing, promotional and other programs, product development, merchandising, public relations, administrative expenses, programs designed to increase sales and enhance and further the public reputation of FRANCHISOR and each applicable System, and activities related to any and all of the foregoing. The content of all activities of the Fund(s), including, without limitation, the media selected and employed, as well as the area and units to be targeted for such activities, shall be at the sole discretion of FRANCHISOR. FRANCHISOR undertakes no obligation to make expenditures for FRANCHISEE which are equivalent or proportionate to contributions paid under this Agreement or to insure that FRANCHISEE benefits directly or on a prorata basis from activities of the Fund(s), if any. Upon request, FRANCHISOR will provide FRANCHISEE a statement of receipts and disbursements for any Fund to which FRANCHISOR contributes under the terms of this Agreement, prepared by an independent public accountant for each fiscal year of the Fund.

3.1    FRANCHISEE, prior to using any advertising or promotional material that FRANCHISEE has prepared for use in its local area, shall submit such material to FRANCHISOR for review and approval. If written disapproval of the advertising and promotional material is not received by FRANCHISEE from FRANCHISOR within fifteen (15) days from the date such material is received by FRANCHISEE, said materials shall be deemed approved for use by FRANCHISEE, unless and until subsequently disapproved by FRANCHISOR, in which event FRANCHISEE will promptly discontinue any further use thereof.

3.2    FRANCHISEE acknowledges that this Agreement grants FRANCHISEE no right to use any of the Proprietary Marks to advertise products and/or services for order through the mail or by any electronic or other medium. FRANCHISEE shall not, without the prior written approval of FRANCHISOR, use any of the Proprietary Marks on the Internet or any similar electronic or other communications medium, to promote FRANCHISEE's business and/or advertise and/or sell products and/or services. Notwithstanding the provisions of paragraph 3.1 above, FRANCHISOR's failure to disapprove any request to use the Internet or any similar electronic or other medium within fifteen (15) days shall not give FRANCHISEE the right to undertake such use. FRANCHISOR shall have the sole right to establish an Internet "home page" using any of the Proprietary Marks, and to regulate the establishment and use of linked home pages by its franchisees.

3.3    Special Terms and Conditions for each System authorized for this Unit are attached to this Agreement and contain additional provisions related to advertising and promotion.

## Section 4. Payments

4.0    FRANCHISEE shall pay to FRANCHISOR the following initial charges and continuing fees:

4.1    **Initial Franchise Fee.** - FRANCHISEE shall pay FRANCHISOR an Initial Franchise Fee in the amount set forth in Item "C" of the Contract Data Schedule of this Agreement. Unless the Initial Franchise Fee was prepaid under the terms of a Store Development Agreement, five thousand dollars ($5,000.00) shall be paid upon the execution of this Agreement and the remaining unpaid balance within ten (10) days after FRANCHISEE's receipt of FRANCHISOR's written approval of the Premises; provided however, if the Premises is developed by FRANCHISOR, the balance shall be due in full upon FRANCHISEE's execution of the Lease of the Unit, or on the date FRANCHISEE or the Designated Representative commences FRANCHISOR's training program, whichever date is earlier.

4.2    **Marketing Start-Up Fee.** - FRANCHISEE shall pay a Marketing Start-Up Fee in the amount set forth in Item "D" of the Contract Data Schedule of this Agreement, for a start-up promotional program or such other promotion or advertising program as FRANCHISOR may specify. Payment shall be made in full prior to attendance by FRANCHISEE or the Designated Representative at FRANCHISOR's training program or thirty (30) days prior to the scheduled opening of the Unit, whichever date is earlier, and shall be nonrefundable after the Unit commences operations.

-4-

4.3    **Continuing Franchise Fees** - FRANCHISEE shall pay FRANCHISOR at Post Office Box 1097, Charlotte, North Carolina 28201-1097 (or to such other address as FRANCHISOR shall from time to time advise FRANCHISEE in writing), on or before Thursday of each week, a sum determined by multiplying the Gross Sales of the Unit for the seven (7) day period ending at the close of business on the preceding Saturday times the percentage set forth in Item "E" of the Contract Data Schedule of this Agreement.

4.4.    **Continuing Advertising Fee.** FRANCHISEE shall also pay, at the same time, for the same seven (7) day period, in the same manner as, and in addition to the payments provided for under paragraph 4.3 above, the percentage set forth in Item "F" of the Contract Data Schedule of this Agreement, of the Gross Sales of the Unit, to one or more Funds for advertising, marketing, promotion and other purposes, as specified in Section 3 of this Agreement.

4.4.1    In addition, FRANCHISEE shall participate in and make additional payments to the Fund(s) with respect to all advertising, marketing, promotion and other programs of each authorized brand at the Unit, which from time to time are supported by two-thirds of the units of such brand in the market in which the Unit is located with respect to local programs, and in the continental United States, with respect to national programs.

4.4.2    If FRANCHISEE is authorized to use more than one (1) System at the Unit, fees payable under this paragraph 4.4 with respect to each System shall apply only to that portion of the Unit's Gross Sales which are applicable to that System, as determined by FRANCHISOR.

4.5    If any sales, income, excise, use or privilege tax is imposed or levied by any government or governmental agency on account of the payment of franchise or royalty fees by FRANCHISEE under this Agreement, FRANCHISEE shall pay FRANCHISOR a sum equal to the amount of such tax as an additional royalty fee (but this provision shall not apply to federal or state income taxes imposed upon FRANCHISOR).

4.6    FRANCHISOR shall have the right to require FRANCHISEE, upon written notice, to make payments under this Agreement by electronic funds transfer or to a lock-box located at an independent bank. Acceptance of payment by electronic funds transfer or to a lock-box shall not be deemed a waiver of any rights of FRANCHISOR. If FRANCHISOR establishes a direct debit program with FRANCHISEE's bank for the electronic payment of continuing franchise and advertising or sales promotion fees, FRANCHISEE must provide FRANCHISOR with all consents, authorizations and bank account data necessary to effect such electronic payment.

4.6.1    FRANCHISEE must complete and deliver to FRANCHISOR such forms as may from time to time be required to effectuate any changes as necessary to maintain EFT capability. FRANCHISEE agrees (a) to give FRANCHISOR at least fourteen days written notice (except in the case of emergency) before making any change to FRANCHISEE's EFT bank account, providing all information and specimens required to change EFT to the new account; (b) to pay FRANCHISOR its then-current late fee, plus collection costs and reasonable attorney's fees, if FRANCHISEE'S bank rejects FRANCHISOR's EFT request because of insufficient funds; and (c) upon demand, to replace EFT rejected by FRANCHISEE's bank with a bank certified or cashier's check in the aggregate amount owed, plus interest, late fees, collection fees, costs of collection and attorneys fees.

4.6.2    For each week that FRANCHISEE (a) submits a weekly Gross Sales report via FRANCHISOR's approved electronic form over the Internet, and (b) pays the corresponding weekly continuing franchise and advertising fees by EFT, FRANCHISOR will deduct the fees from FRANCHISEE's bank account on or after the Thursday twelve (12) days after the Saturday of the week for which sales were reported. This benefit will only become available after FRANCHISOR implements an electronic form for reporting weekly sales satisfactory to FRANCHISOR. To have this benefit available, FRANCHISEE must have computer equipment capable of accessing and using the electronic form in the manner required. In FRANCHISOR's discretion or due to system failure, FRANCHISOR may elect to withdraw the electronic form. In any such case, FRANCHISEE must immediately return to reporting Gross Sales in the manner originally required.

4.7    **Late Fee, Interest and Costs.** If any payment required under this Agreement is not paid when due, FRANCHISEE shall pay, in addition to the unpaid amount, FRANCHISOR's then-current late fee for each unpaid invoice. In addition, all amounts payable by FRANCHISEE to FRANCHISOR under any provision of this Agreement, if not paid when the same becomes due, shall bear interest from the date due until paid at the rate of one and one-half percent (1.5%) per month, or the maximum rate permitted by law, whichever is less. Entitlement to such interest shall be in addition to any other remedies FRANCHISOR may have. Receipt of any check, draft or other commercial paper shall not constitute payment until all funds therefrom are collected by FRANCHISOR. FRANCHISEE shall pay all collection charges, including reasonable attorney's fees, on dishonored checks. At FRANCHISOR's request, dishonored and returned checks will be promptly replaced by FRANCHISEE by a bank certified or cashiers check in the aggregate amount owed, plus interest, late fees, collection fees, costs of collection and attorneys fees, set forth in this Agreement.

## Section 5. Covenants of FRANCHISEE

5.0    FRANCHISEE understands and acknowledges the importance to FRANCHISOR, FRANCHISEE and other franchisees, of FRANCHISEE's commitment to at all times operate the Unit in accordance with FRANCHISOR's Standards (as defined in Definitions paragraph "I"), in order to increase the demand for FRANCHISOR's products, to protect and enhance the reputation and goodwill of FRANCHISOR, to promote and protect the value of the Proprietary Marks and other reasons. FRANCHISEE agrees to devote continuous best efforts to successfully develop, manage and operate the Unit and to enhance the goodwill of the Proprietary Marks authorized by this Agreement and the System(s) as a whole.

5.0.1    If, in any consecutive twelve (12) month period, FRANCHISEE shall receive two (2) or more notices to cure any default under this Agreement, FRANCHISOR shall have the right, in addition to all other remedies available, to require that FRANCHISEE (in lieu of any Designated Representative) devote full time to managing the day-to-day operation of the Unit.

*General Terms and Conditions*

5.0.2    FRANCHISEE agrees to operate the Unit in strict accordance with all of FRANCHISOR's Standards as they may be communicated to FRANCHISEE from time to time. Standards shall be established for and distributed to franchisees generally and/or FRANCHISEE specifically, in such form and content as FRANCHISOR may from time to time in its sole discretion prescribe. Standards are copyrighted and FRANCHISEE shall not at any time copy, duplicate, record or otherwise reproduce any materials, in whole or in part, which set forth the standards or other proprietary information, or otherwise make the same available to any unauthorized person. FRANCHISEE shall at all times maintain the documents embodying the Standards at the Unit (or at FRANCHISEE's principal offices, if not the Unit) and shall ensure that such documents are kept current and up to date. In the event of a dispute as to the contents of the Standards, the terms of the master copy(s) maintained by FRANCHISOR shall control.

5.0.3    FRANCHISEE acknowledges that complete uniformity may not be possible or practical throughout the System(s) and agrees that FRANCHISOR may from time to time vary Standards, as FRANCHISOR may deem necessary or desirable for the System(s) or the Unit.

5.1    **Unit Operations.** - FRANCHISEE shall keep the Unit open and in continuous normal operation for such hours as FRANCHISOR shall from time to time direct, provided, however, no longer than the maximum number of hours per day permitted by law, on all days except Christmas and Thanksgiving, unless prior written approval is obtained from FRANCHISOR or unless FRANCHISOR otherwise directs in writing. In connection therewith, but without limitation, FRANCHISEE further agrees as follows:

5.1.1    FRANCHISEE shall use all products, materials, ingredients, supplies, paper goods, uniforms, fixtures, furnishings, signs, equipment, methods of exterior and interior design and construction and methods of product storage, handling, preparation, packaging, delivery and sale prescribed by FRANCHISOR. All such items must conform to FRANCHISOR's Standards. FRANCHISOR reserves the right to specify any item by brand. FRANCHISEE shall carry out the business covered by this Agreement in accordance with the operational Standards established by FRANCHISOR and set forth in FRANCHISOR's operating manuals and other documents as they presently exist or shall exist in the future or as may be otherwise disclosed to franchisees from time to time.

5.1.2    FRANCHISEE shall refrain from using or selling any products, materials, ingredients, supplies, paper goods, uniforms, fixtures, furnishings, signs, equipment and methods of product storage, handling, preparation, packaging, merchandising, and delivery, or any other items of any kind, which do not meet FRANCHISOR's Standards. Without limiting the generality of the foregoing, FRANCHISEE shall immediately rectify all hazardous situations, and immediately remove and destroy any and all hazardous products. For purposes of the foregoing sentence, "hazardous situations" are those which have the potential to cause injury, illness or death, and "hazardous products" are products which are unfit for human consumption or which have the potential to cause injury, illness or death.

5.1.3    FRANCHISEE shall offer for sale all products that FRANCHISOR may, from time to time in its sole discretion, designate in writing as approved for sale at the Unit. FRANCHISEE shall sell, distribute and deliver such products only in weights, sizes, forms and packages as are approved in writing by FRANCHISOR. FRANCHISEE further agrees to discontinue offering for sale any product that FRANCHISOR may, at any later time, in its sole discretion, by written notice withdraw approval for sale at the Unit; and FRANCHISEE agrees to refrain from offering for sale any product or products which have not been designated in writing as approved by FRANCHISOR for sale at the Unit. FRANCHISOR may disapprove FRANCHISEE's sale of any product(s) or FRANCHISEE's participation in any program(s), in the event FRANCHISEE fails to comply with operational Standards at the Unit. FRANCHISEE shall have sole and complete discretion as to the price FRANCHISEE charges for all products.

5.1.4    FRANCHISEE shall maintain at all times a sufficient supply of approved products to meet the demand of FRANCHISEE's customers at the Unit.

5.1.5    FRANCHISEE shall purchase all food products, supplies, equipment and materials required for the operation of the Unit from FRANCHISOR or from suppliers who (a) demonstrate, to the reasonable satisfaction of FRANCHISOR, the ability to meet all of FRANCHISOR's Standards for such items, (b) possess adequate capacity and facilities to supply the needs of FRANCHISEE and other franchisees in the quantities, at the times and with the reliability requisite to an efficient operation, and (c) have been approved, in writing, by FRANCHISOR. Prior to purchasing any items from any supplier not previously approved by FRANCHISOR, FRANCHISEE shall submit to FRANCHISOR a written request for approval of the supplier. FRANCHISOR may require that samples from the supplier be delivered to FRANCHISOR or to a designated independent testing laboratory for testing prior to approval and use. FRANCHISEE shall pay FRANCHISOR a fee not to exceed the actual cost of the test; provided, however, no fee shall be charged for the first test requested by FRANCHISEE in any calendar year. This paragraph is subject to Special Terms and Conditions which contain additional provisions and limitations specific to the System(s) authorized for the Unit by this Agreement.

5.1.6    FRANCHISEE shall maintain, at all times and at FRANCHISEE's expense, the interior and exterior of the Unit and all fixtures, furnishings, signs and equipment in the highest degree of cleanliness, orderliness, sanitation and repair, as reasonably required by FRANCHISOR. FRANCHISEE shall make no material alteration, addition, replacement or improvement in or to the interior or exterior of the Unit (including the parking lot and landscaped areas) without FRANCHISOR's prior written consent.

5.1.7    FRANCHISEE shall comply with all civil and criminal laws, ordinances, rules, regulations and orders of public authorities pertaining to the maintenance and operation of the Unit, including, but not limited to, those relating to health, safety, sanitation, employment, environmental regulation and taxation.

-6-

5.1.7.1  FRANCHISEE agrees to maintain as business records provided in subsection 5.2 below, and to furnish to FRANCHISOR within five (5) days after receipt of written demand therefor, copies of all customer complaints and notices, warnings, citations, inspection reports and other communications related to the Unit from public authorities. FRANCHISEE hereby authorizes any such public authority to provide FRANCHISOR with copies of such notices and/or communications. If any suit, investigation or other legal proceeding related to FRANCHISEE's business should be commenced by or against FRANCHISEE, FRANCHISEE shall immediately notify FRANCHISOR thereof and keep FRANCHISOR continuously advised of the status of the matter.

5.1.8  FRANCHISEE shall manage the Unit at all times with at least two (2) individuals, one of whom must be FRANCHISEE, or a partner, shareholder or member of FRANCHISEE, either of whom must be the Designated Representative and both of whom must have successfully completed FRANCHISOR's training program. Both individuals must have literacy and fluency in the English language sufficient, in FRANCHISOR's opinion, to satisfactorily complete FRANCHISOR's training program and to communicate with employees, customers, and suppliers. If FRANCHISEE operates more than one unit, FRANCHISOR requires that each additional unit be managed by a Designated Representative approved by FRANCHISOR.

5.1.8.1  In the event of any resignation, termination, disability, death or other incapacity of the Designated Representative, FRANCHISEE shall notify FRANCHISOR in writing of the name of a qualified successor Designated Representative as soon as possible, but in no event later than two (2) months after such event.

5.1.8.2  FRANCHISEE shall hire, train and supervise efficient, competent and courteous employees of good character for the operation of the Unit and shall ensure that all such employees are trained in accordance with FRANCHISOR's training procedures. FRANCHISEE is solely responsible for hiring and discharging employees of the Unit, and for setting their wages and terms of employment. FRANCHISEE shall ensure that all employees whose duties include customer service have sufficient literacy and fluency in the English language to adequately serve the public in the Unit. FRANCHISEE (or the Designated Representative, as specified by FRANCHISOR) shall attend, and FRANCHISEE shall require employees at the Unit to attend, such further training as FRANCHISOR shall from time to time reasonably require. The cost of training materials, salaries, accommodations and travel expenses, if any, of FRANCHISEE or any other individual employed in the Unit will be borne entirely by FRANCHISEE. FRANCHISEE will bear the cost of all training programs except FRANCHISOR's initial training program referred to in paragraph 2.1.2 of this Agreement.

5.1.9  FRANCHISEE shall accurately report all Gross Sales to FRANCHISOR and implement all procedures recommended by FRANCHISOR to minimize employee theft. FRANCHISEE further acknowledges and agrees that employee theft shall not relieve FRANCHISEE of the obligation to make all payments to FRANCHISOR based on Gross Sales pursuant to Section 4 of this Agreement and that accurate reporting of Gross Sales requires, among other things, compliance with all Standards related thereto and recording all sales at the time the product is delivered to the purchaser, including, without limitation, retail, wholesale and bulk discount sales, whether for cash, by redemption of gift certificates or coupons, or sales for which payment may be deferred.

5.2  **Books, Records and Reports.** FRANCHISEE shall keep full, complete and accurate books and accounts with respect to the Unit, in accordance with generally accepted accounting principles and all requirements of law and in the form and manner prescribed below or as from time to time further prescribed by FRANCHISOR. Commencing upon the opening of the Unit:

5.2.1  FRANCHISEE shall submit to FRANCHISOR, on or before Thursday of each week, on a standard form approved by FRANCHISOR, a signed statement of Gross Sales at the Unit for the seven (7) day period ending at the close of business on the preceding Saturday, along with all moneys required to be paid under Section 4 of this Agreement.

5.2.2  FRANCHISEE shall submit to FRANCHISOR, on a standard form approved by FRANCHISOR, within forty-five (45) after the close of each of FRANCHISEE's calendar or fiscal month, a profit and loss statement of the Unit for said monthly period.

5.2.3  FRANCHISEE shall submit to FRANCHISOR, on a standard form approved by FRANCHISOR, within forty five (45) days after the close of each applicable period, a profit and loss statement prepared in accordance with generally accepted accounting principles, along with a balance sheet (including a statement of retained earnings or partnership account) (i) for the first six (6) months of each of FRANCHISEE's fiscal year; and (ii) for the full twelve (12) months of each of FRANCHISEE's fiscal years. FRANCHISOR shall have the right, in its sole discretion, to require that such annual financial statements be certified by an independent certified public accountant or such other independent public accountant acceptable to FRANCHISOR.

5.2.4  FRANCHISEE shall submit to FRANCHISOR, at the times and in the form required, such other periodic reports and information as may from time to time be prescribed by FRANCHISOR.

5.2.5  FRANCHISEE shall preserve, in the English language and for the time periods set forth below, all books, tax returns, accounting records and supporting documents relating to the FRANCHISEE's business operations at the Unit (hereinafter called the "Records"), including but not limited to:

    a. daily cash reports;
    b. cash receipts journal and general ledger;
    c. cash disbursements journal and weekly payroll register;
    d. monthly bank statements, and daily deposit slips and canceled checks;
    e. all business tax returns;
    f. suppliers invoices (paid and unpaid);

*General Terms and Conditions*

g. dated cash register tapes (detailed and summary);

h. semi-annual balance sheets and monthly profit and loss statements;

i. weekly inventories;

j. records of promotion & coupon redemptions;

k. such other records and information as FRANCHISOR may from time to time request.

FRANCHISEE shall be permitted to preserve Records and submit reports electronically, in accordance with FRANCHISOR's Retail Information System ("RIS") and/or other requirements, or otherwise with the prior written approval of FRANCHISOR. During the term of this Agreement, FRANCHISEE shall preserve and make available to FRANCHISOR all Records for no less than the current fiscal year and the three (3) immediate-past fiscal years. For three (3) years after the date of any transfer of any interest in this Agreement, the transferor of such interest shall preserve and make available to FRANCHISOR all Records of its last three (3) fiscal years of operation under this Agreement. For a period of three (3) years after the expiration of the term of this Agreement (or after any earlier termination thereof) FRANCHISEE shall preserve and make available to FRANCHISOR all Records for the last three (3) fiscal years of FRANCHISEE's business operation at the Unit.

5.2.6     Retail Information System FRANCHISEE shall record all sales at or from the Unit at the time of sale, in accordance with FRANCHISOR's procedures and on devices, the make, model and serial numbers of which have been individually approved in writing by FRANCHISOR. Such devices must record accumulated sales in a manner that cannot be turned back or reset, and must retain data in memory storage in the event of power loss. FRANCHISEE shall, at its sole cost and expense, upon notice from FRANCHISOR, purchase or lease and install a unit and/or network information technology system, including computers, printers, touch heads, cash drawers, software and other equipment designated by FRANCHISOR for the Unit (hereinafter for convenience called "RIS"). The term "RIS" includes, without limitation, all hardware and software designated from time to time by FRANCHISOR and the data stored thereon by FRANCHISEE. Some or all components of RIS may be licensed to FRANCHISOR and used by FRANCHISEE as a sub-licensee. FRANCHISEE shall use RIS solely in connection with the operation of the Unit, in the manner specified by FRANCHISOR from time to time. FRANCHISEE shall comply with such requirements determined by FRANCHISOR from time to time regarding maintenance, training, storage and safeguarding of data, records, reports and other matters relative to RIS.

5.2.6.1   FRANCHISEE shall, at its sole cost and expense: (a) attend, and/or cause the Designated Representative and/or employees in the Unit to attend, such initial and other RIS training as is specified by FRANCHISOR; (b) maintain RIS in continuous operation at the Unit; (c) purchase an ongoing maintenance and support contract from an approved supplier and replace the RIS components as necessary, (d) upgrade RIS from time to time as may be reasonably required by FRANCHISOR; (e) permit FRANCHISOR immediate access to RIS, electronically or otherwise, at all times without prior notice to FRANCHISEE (such access shall not unreasonably interfere with FRANCHISEE's normal Unit operations); and (f) install and maintain telephone or other service required by FRANCHISOR to permit such access.

5.2.6.2   FRANCHISEE shall, at its sole cost and expense, upon FRANCHISOR's request, replace RIS with the computers, printers, touch heads, cash drawers, software and other equipment designated by FRANCHISOR from time to time as FRANCHISOR's then-current unit and/or network information system. Such replacements shall take place when deemed advisable by FRANCHISOR given the age, cost to operate, condition of the information system then in the Unit, the then-current and anticipated technology, the information systems then in use at other Units, the needs of the System(s), and other factors as may be relevant.

5.2.6.3   FRANCHISOR makes no representation or warranty as to the costs, sales, or profits, if any, which may result from the installation and use of RIS and its replacements.

5.2.7     FRANCHISOR shall treat any Records received from FRANCHISEE pursuant to this subsection 5.2 as confidential, except that information may be released (a) to any person entitled to the same under any Lease; (b) in connection with any court order, legal proceeding or other dispute resolution process, whether instituted by FRANCHISOR or any other party; (c) to a prospective transferee of any interest subject to the provisions of Section 10 of this Agreement, and (d) as incorporated into anonymous general information disseminated to FRANCHISOR's franchisees and prospective franchisees, and in the formulation of plans and policies in the interest of the System(s).

5.3     **Insurance.** FRANCHISEE shall procure, before the commencement of business, and maintain in full force and effect during the entire term of this Agreement, at FRANCHISEE's sole expense, an insurance policy or policies protecting FRANCHISEE and FRANCHISOR, and their directors and employees, against any loss, liability, including without limitation employment practices liability, or expense whatsoever from, without limitation, fire, personal injury, theft, death, property damage or otherwise, arising or occurring upon or in connection with FRANCHISEE's operation of the Unit or by reason of FRANCHISEE's occupancy of the Premises.

5.3.1     Such policy or policies shall include:

5.3.1.1   commercial general liability insurance, including but not limited to, product, contractual, and owned and non-owned vehicle liability coverages, with an aggregate single limit of two million dollars ($2,000,000.00) or such higher limit as FRANCHISOR, in its sole and absolute discretion, may from time to time require, and as may be required under the terms of any Lease or underlying lease for the Unit, for bodily injury and property damage combined; and

5.3.1.2   "All Risk" property damage insurance, including without limitation flood and earthquake protection, for the full replacement cost value of the Premises and all other property within or relating to the Unit, including signs, with no coinsurance clause and with a replacement cost clause attached; and

-8-

5.3.1.3  plate glass insurance and, if applicable, boiler insurance; and

5.3.1.4  employer's liability, worker's compensation and such statutory insurance as may be required in the state in which the Premises is located.

5.3.2    All insurance required under the terms of this Agreement (i) shall be written in the names of FRANCHISEE, FRANCHISOR and/or other party or parties designated by FRANCHISOR, as their respective interest may appear, by insurance companies reasonably acceptable to FRANCHISOR; (ii) shall contain provisions denying to the insurer acquisition by subrogation of rights of recovery against any party named; (iii) shall provide that cancellation or alteration cannot be made without at least thirty (30) days written notice to any party named; and (iv) shall not be limited in any way by reason of any insurance which may be maintained by FRANCHISOR or any other party named.

5.3.3    During the term of this Agreement, FRANCHISEE shall promptly unless otherwise directed by FRANCHISOR, (but in no event later than ten (10) days after any such policy becomes effective or such payment is due) furnish FRANCHISOR with duplicate originals of all insurance policies, including renewal and replacement policies, together with evidence that all premiums have been paid. If at any time FRANCHISEE fails to comply with the provisions of this subsection 5.3, FRANCHISOR, in addition to all other remedies available, shall have the right (but not the obligation) to obtain and/or maintain such insurance with respect to the Unit and/or Premises, at FRANCHISEE's sole expense. FRANCHISEE shall pay FRANCHISOR when and as billed for the cost of premiums therefor. Maintenance of insurance and FRANCHISEE's perfor-mance of the obligations contained in this subsection 5.3 shall not relieve FRANCHISEE of liability under the indemnity provisions set forth in paragraph 5.4 below.

5.3.4.   Each of the parties hereby waives any and all rights of recovery against the other parties hereto, or against the officers, employees, agents, and representatives of such other parties, for damage to such waiving party or for loss of its property or the property of others under its control to the extent that such loss or damage is insured against under any insurance policy in force at the time of such loss or damage. FRANCHISEE shall, upon obtaining the polices of insurance required hereunder, give notice to the insurance carrier or carriers that the foregoing mutual waiver of subrogation is contained in this Agreement.

5.4      **Indemnification.** FRANCHISEE shall save, defend, exonerate, indemnify and hold harmless FRANCHISOR, and each of them, and the subsidiaries or each of them, and their respective officers, directors, employees, agents, successors and assigns, from and against (i) any and all claims based upon, arising out of, or in any way related to the operation or condition of any part of the Unit or the Premises, the conduct of business thereupon, the ownership or possession of real or personal property and any negligent act, misfeasance or nonfeasance by FRANCHISEE or any of its agents, contractors, servants, employees, or licensees, and including, without limitation, all obligations of FRANCHISEE incurred pursuant to any provisions of this Agreement, and (ii) any and all fees (including reasonable attorneys' fees), costs and other expenses incurred by or on behalf of FRANCHISOR in the investigation of or defense against any and all such claims.

5.5      **Refurbishment & Remodel of the Premises.** FRANCHISEE shall timely complete future refurbishments and remodels of the Unit in accordance with this subsection 5.5. Such refurbishments and remodels are in addition to FRANCHISEE's continuing obligations to maintain, repair and replace all equipment, signage, furnishing, decor and personal property related to the Unit in accordance with FRANCHISOR's standards. FRANCHISEE's obligations to maintain, repair and replace shall not be delayed or deferred pending or in anticipation of any such refurbishment or remodel.

5.5.1    No later than the Refurbishment Date set forth in Item "G" of the Contract Data Schedule of this Agreement, and at the end of each ten (10) year period thereafter (if this Agreement is renewed), FRANCHISEE shall refurbish the Unit in accordance with FRANCHISOR's then-current refurbishment standards. It is intended that the cost of the initial refurbishment shall not exceed $10,000.00 and that subsequent refurbishments shall not exceed $10,000.00 increased by the same percentage as the increase to the Consumer Price Index (all cities average) published by the U.S. Department of Labor for the period from the Refurbishment Date to the date of subsequent refurbishment. The refurbishment required of the FRANCHISEE shall be generally the same as then required of units of the same age and condition. The above refurbishing costs do not include costs for required maintenance and repair or costs to upgrade, change or replace the Retail Information System.

5.5.2    No later than the Remodel Date set forth in Item "G" of the Contract Data Schedule of this Agreement, and at the end of each ten (10) year period thereafter (if this Agreement is renewed), FRANCHISEE shall remodel the Unit in accordance with FRANCHISOR's then-current remodeling standards (including but not limited to fixtures, furnishings, signs and equipment). The remodeling required of FRANCHISEE shall be generally the same as then required of units of the same age, condition, location and geographic region.

5.5.3    FRANCHISEE acknowledges and agrees that the requirements of this subsection 5.5 are both reasonable and necessary to ensure continued public acceptance and patronage of the System(s), to avoid deterioration or obsolescence of the Unit and to take advantage of changes and improvements in design, concept and decor.

5.6      **Cross-Guarantee.** In the event FRANCHISEE, or any partner, member or shareholder of FRANCHISEE, now holds or hereafter acquires an interest in any other unit franchised by FRANCHISOR, FRANCHISEE shall be jointly and severally liable to FRANCHISOR as guarantor of the obligations of the franchisee under each franchise Agreement for such other unit(s). Included in such guaranty are, without limitation, payment of all franchise fees, advertising fees, equipment payments, note payments, rental and other Lease payments to FRANCHISOR or any of its subsidiaries, if applicable, collection fees and general receivables now or hereafter due and payable to FRANCHISOR or guaranteed by FRANCHISOR to any third party. FRANCHISEE's liability under this paragraph shall be limited to the extent that the

*General Terms and Conditions*

total sum due and payable by FRANCHISEE upon the account or debt of any other franchisee in default shall not exceed the total interest (as hereinafter defined) that the common shareholder(s), member(s) or partner(s), as the case may be, hold in FRANCHISEE. For this purpose, "interest" shall include without limitation, all equity in, assets, real estate interests of, loans or other financial interests of FRANCHISEE, held by or controlled by the common shareholder(s), member(s) or partner(s) or their immediate family, as the case may be. The terms of this paragraph shall not operate to extend any personal guaranty of any Lease obligations by any shareholder(s), member(s) or partner(s), after such guaranty shall have ended by its terms.

5.7     **FRANCHISEE Entity.** FRANCHISEE may be a sole proprietorship, a general partnership, a corporation or a limited liability company ("LLC"). FRANCHISEE may not be a limited partnership, trust or other entity not specifically authorized herein or approved by FRANCHISOR in writing.

5.7.1     **Corporation.** If FRANCHISEE is a corporation, (i) said corporation's charter shall provide that it is authorized to operate the Unit as provided under this Agreement; (ii) all shareholders of the corporation shall enter into a written Agreement, in a form satisfactory to FRANCHISOR, to jointly and severally guaranty the full payment and performance of the corporation's obligations to FRANCHISOR and to assume all personal obligations required of partners, members and/or shareholders contained in this Agreement; (iii) each stock certificate of the corporation shall have conspicuously endorsed upon it a statement that it is held subject to, and that further assignment or transfer thereof is subject to all restrictions imposed upon transfers by this Agreement; and (iv) no new shares of common or preferred voting stock in the corporation shall be issued to any person, persons, partnership, association, LLC or corporation without obtaining FRANCHISOR's prior written consent, pursuant to Section 10 of this Agreement. FRANCHISEE shall at all times maintain a current list of all owners of record and all beneficial owners of any class of voting stock of FRANCHISEE and shall furnish the list to FRANCHISOR upon request.

5.7.2     **LLC.** If FRANCHISEE is an LLC, (i) said LLC's operating agreement shall provide that its activities are limited to operating the Unit as provided under this Agreement; (ii) all members of the LLC shall enter into a written agreement, in a form satisfactory to FRANCHISOR, to jointly and severally guaranty the full payment and performance of the LLC's obligations to FRANCHISOR and to assume all personal obligations required of partners, members and/or shareholders contained in this Agreement; (iii) the LLC's operating agreement shall provide that any assignment or transfer of membership interests in the LLC is subject to all restrictions imposed upon transfers by this Agreement; and (iv) no new membership interest(s) in the LLC shall be created for, issued or granted to any person, persons, partnership, association LLC or corporation without obtaining FRANCHISOR's prior written consent, pursuant to Section 10 of this Agreement. FRANCHISEE shall at all times maintain a current list of all members of record of FRANCHISEE and shall furnish the list to FRANCHISOR upon request.

### Section 6. Certain Rights of FRANCHISOR

6.0     In order to preserve the validity and integrity of the Proprietary Marks and to assure that the Standards of the System(s) are properly employed by FRANCHISEE in the operation of the Unit and, in general, to verify FRANCHISEE's compliance with the terms of this Agreement, FRANCHISOR, or its agents, shall have the right, at all times, with or without prior notice to FRANCHISEE, to enter and inspect any and all public or private area(s) of the Unit and to select materials, ingredients, products, supplies, paper goods, uniforms, fixtures, furnishings, signs and equipment for evaluation purposes to assure that these items conform to the Standards of the System(s). During the course of any such inspection, FRANCHISOR may photograph or videotape any part of the Unit, whether or not FRANCHISEE is present. FRANCHISOR may require FRANCHISEE to remove any item which does not conform to applicable Standards. FRANCHISOR may also, at FRANCHISEE's expense, remove or destroy any item which does not conform to applicable Standards.

6.1     If FRANCHISOR finds any condition on the Premises which FRANCHISOR deems to be hazardous, unsafe, unhealthy, unsanitary, unclean or in material disrepair, FRANCHISOR shall have the following rights in addition to all other rights set forth in this Agreement:

6.1.1     FRANCHISOR shall have the right to require FRANCHISEE to immediately close and suspend operation of the Unit, and/or to require such other actions as FRANCHISOR, in its sole discretion, deems necessary, whenever there is reason to believe that any products in the Unit are contaminated, or for other reasons of imminent risk to public health and safety. FRANCHISEE agrees to notify FRANCHISOR immediately of any suspected product contamination or other violation affecting public health or safety and to promptly take any action which FRANCHISOR requires in connection therewith. FRANCHISEE shall be solely responsible for all losses, costs or other expenses it incurs in complying with the provisions of this subsection 6.1; and/or

6.1.2     FRANCHISOR shall have the right to immediately remove or destroy, at FRANCHISEE's expense, any product which FRANCHISOR believes to be hazardous, contaminated or to otherwise pose an imminent risk to public health or safety; or

6.1.3     FRANCHISOR shall have the right to give FRANCHISEE twenty-four (24) hours written notice requiring the correction of an unsafe, unhealthy, unsanitary or unclean condition, or thirty (30) days written notice requiring maintenance, repairs or alterations to the Unit or correction of any other Standards violation. If FRANCHISEE has not within that time corrected the condition or completed the maintenance, repairs or alterations, as the case may be, FRANCHISOR may enter the Unit, without being guilty of, or liable for, trespass or tort, and may cause the condition to be corrected or the maintenance, repair, or alteration to be completed at the expense of FRANCHISEE and without prejudice to any other rights or remedies of FRANCHISOR.

-10-

6.2    In addition to FRANCHISOR's right to access information through the Retail Information System and otherwise, FRANCHISOR's representatives shall have the right to examine FRANCHISEE's original books, Records and supporting documents at reasonable times, and to perform, with or without notice to FRANCHISEE, such inspections, tests and other analyses as it deems appropriate to verify Gross Sales at the Unit. If FRANCHISOR determines that the Gross Sales FRANCHISEE reported to FRANCHISOR are less than the Gross Sales ascertained by FRANCHISOR's analysis, FRANCHISEE shall immediately pay to FRANCHISOR all amounts owing to FRANCHISOR, the applicable Fund and FRANCHISOR's affiliated landlord corporation based upon the corrected Gross Sales. If an analysis is undertaken due to (i) FRANCHISEE's failure to maintain the Retail Information System in continuous operation, or (ii) FRANCHISEE's failure to prepare, deliver or preserve statements or Records required by subsection 5.2 of this Agreement, or (iii) if any analysis of FRANCHISEE's books and Records results in the discovery of a discrepancy greater than three percent (3%) in the Gross Sales reported by FRANCHISEE, FRANCHISEE shall pay, in addition to the unpaid amounts owed FRANCHISOR, its affiliated landlord corporation and the applicable Fund, interest thereon from the date payment was due, at 18% per annum or the highest permissible rate. FRANCHISEE shall also reimburse FRANCHISOR for all related expenses, including, but not limited to, reasonable investigation, accounting and legal fees and other reasonable expenses and costs such as travel, payroll and overhead expenses for FRANCHISOR's employees. Such payments shall be without prejudice to any other remedies FRANCHISOR may have under this Agreement, including the right to terminate this Agreement, without opportunity to cure, in the case of intentional under-reporting of Gross Sales.

6.3    In the event that FRANCHISOR shall believe there may have been intentional under-reporting of Gross Sales for the Unit, FRANCHISEE (and all partners, members and shareholders of FRANCHISEE) shall, upon written demand from FRANCHISOR provide FRANCHISOR, in addition to Records described in paragraph 5.2.5, personal federal and state tax returns, bank statements (including deposit slips and canceled checks) and such other documents and information as FRANCHISOR may in its sole discretion request in connection with FRANCHISOR's efforts to verify Gross Sales reported to FRANCHISOR under this Agreement or any Lease of the Unit. Information provided by FRANCHISEE under this paragraph 6.3 shall be subject to the confidentiality provisions of paragraph 5.2.7, except that exclusion (c) therein does not apply. Schedules to personal tax returns and other financial data which are unrelated to the business of the Unit need not be provided by any partner, member or shareholder of FRANCHISEE who has not been active in the business, and, in addition, has not directly or indirectly owned or controlled at least a majority interest in the business at the Unit, alone or in conjunction with any other family member or related entity.

6.4    FRANCHISEE hereby grants FRANCHISOR the right to inspect the records of all suppliers, distributors, group purchasing programs, distribution centers, and other third parties supplying food products, supplies, equipment and materials to FRANCHISEE and hereby authorizes such parties to release records of FRANCHISEE's purchases and deliveries to FRANCHISOR, by electronic transfer or otherwise, at such times and places as FRANCHISOR shall request.

6.5    If, during the term of this Agreement or any extension or renewal thereof, FRANCHISEE directly or indirectly acquires ownership or control of the Premises, FRANCHISEE agrees to give FRANCHISOR prompt written notice of such ownership or control and to grant FRANCHISOR, under FRANCHISOR's standard Lease Option Agreement, the option to acquire a leasehold interest in the Premises in the event of default by FRANCHISEE under this Agreement or under any lease or mortgage relating to the Premises. Said leasehold interest shall be for the remaining term of this Agreement, including any renewal, at "triple-net" fair market value rental for comparable properties and use in the area as mutually agreed by the parties, or, in the absence of agreement, as determined by arbitration.

## Section 7. Proprietary Marks

7.0    FRANCHISOR has, in connection with its business and the business of its franchisees, developed and used and continues to use and control the usage of Proprietary Marks which are certain proprietary interests, trademarks, service marks, logos, emblems, trade dress and other indicia of origin, including colors, and certain trade names, including but not limited to **Dunkin' Donuts®**, owned by Dunkin' Donuts Incorporated, **Baskin 31 Robbins®**, owned by Baskin-Robbins Incorporated, and **TOGO'S®**, owned by Togo's Eateries, Inc., all of which are registered as trademarks on the Principal Register of the United States Patent and Trademark Office. FRANCHISEE's rights to use specific Proprietary Marks under this Agreement are set forth in the Special Terms and Conditions described in Item "J" of the Contract Data Schedule of this Agreement and attached hereto as a part hereof.

7.1    FRANCHISEE agrees to use the Proprietary Marks only in the manner and to the extent specifically licensed by this Agreement. FRANCHISEE shall not sublicense the Proprietary Marks. FRANCHISEE further agrees that any unauthorized use of the Proprietary Marks during the term of or after expiration or the earlier termination of this Agreement shall constitute an incurable default causing irreparable harm subject to injunctive relief.

7.1.1    FRANCHISEE understands and acknowledges that FRANCHISEE's license to use any or all of the Proprietary Marks is non-exclusive and relates solely to the single location set forth in this Agreement. FRANCHISEE further acknowledges that FRANCHISOR, in its sole discretion, has the right to operate or franchise other units and sales outlets and to grant other licenses in, and to, any or all of the Proprietary Marks, and to develop and establish other systems, products or services using the same or similar Proprietary Marks, or any other proprietary names and marks, and to grant licenses or franchises thereto, in each case at such locations and on such terms and conditions as FRANCHISOR deems acceptable, without providing any rights therein to FRANCHISEE. FRANCHISEE further acknowledges the FRANCHISOR may license others to use the Proprietary Marks at locations and in ways that competes with FRANCHISEE and draws customers from the same area as the Unit.

*General Terms and Conditions*

7.2     FRANCHISEE agrees that, during the term of this Agreement and after the expiration or termination thereof, FRANCHISEE shall not directly or indirectly contest or aid in contesting the validity or ownership of the Proprietary Marks. FRANCHISEE shall not, directly or indirectly, apply to register, register or otherwise seek to use or control or in any way use any of the Proprietary Marks or any confusingly similar form or variation thereof in any place or jurisdiction outside the United States; nor shall FRANCHISEE assist any others to do so.

7.3     FRANCHISEE shall identify itself as the franchisee of the Unit in conjunction with any use of the Proprietary Marks, including, without limitation, uses on letterheads, invoices, order forms, receipts, and contracts. Upon the written request of FRANCHISOR, FRANCHISEE shall display a notice identifying the Unit as being independently owned and operated by FRANCHISEE, in such content and form and at such conspicuous locations on the Premises as FRANCHISOR may designate.

7.4     FRANCHISEE agrees to notify FRANCHISOR promptly of any litigation instituted by FRANCHISEE, or by any person, firm or corporation against FRANCHISEE, relating to the Proprietary Marks. In the event FRANCHISOR undertakes the defense or prosecution of any such litigation, FRANCHISEE agrees to execute any and all documents and do such acts and things as may, in the opinion of counsel for FRANCHISOR, be necessary to carry out such defense or prosecution.

## Section 8. Restrictions on FRANCHISEE's Activities

8.0     During the term of this Agreement, including any extension or renewal thereof, and for a period of two (2) years after expiration or termination of this Agreement, regardless of the cause of termination (hereinafter called the "Post-Term Period"), neither FRANCHISEE, nor any partner, officer, director, shareholder or member of FRANCHISEE, as the case may be, shall:

8.0.1   Divert or attempt to divert any business or customer of the Unit to any competitor, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with FRANCHISOR's Proprietary Marks and System(s);

8.0.2   Directly or indirectly contest or aid in contesting the right of FRANCHISOR or any prospective franchisee of FRANCHISOR to obtain a building permit, zoning variance or other governmental approval required for the development of another location as a unit franchised by FRANCHISOR.; or

8.0.3   Except with respect to the ownership or operation of additional units under Franchises granted by FRANCHISOR, own, maintain, engage in, be employed by, or have any interest in any other business which sells or offers to sell the same or substantially similar products to the type FRANCHISOR requires to be offered by FRANCHISEE at the Unit; provided that, during the Post-Term Period only, the provisions of this paragraph 8.0.3 shall not apply to another business located more than five (5) miles from this or any other unit operating under the same Proprietary Marks of FRANCHISOR. Either party to this Agreement, upon notice in writing to the other during the Post-Term Period, shall have the right to have determined whether said five (5) mile radius is a reasonable restriction on FRANCHISEE's activities, by requesting that the matter be submitted to arbitration in accordance with Section 11 of this Agreement. In such event, the decision of the arbitrator shall be final and binding upon the parties. FRANCHISEE further agrees that, in the event arbitration is requested, FRANCHISEE will engage in no competitive activities pending resolution of the dispute.

8.1     During the term of this Agreement, including any extension or renewal thereof, and for a period of two (2) years after expiration or termination of this Agreement, regardless of the cause of termination, neither FRANCHISEE, nor any partner, officer, director, shareholder or member of FRANCHISEE, as the case may be, shall communicate or divulge to, or use for the benefit of any person, persons, partnership, association or corporation, any information or knowledge concerning the methods of constructing, equipping or operating units under any of FRANCHISOR's Systems and all other information or knowledge which FRANCHISOR deems confidential and which may be communicated to FRANCHISEE, or of which FRANCHISEE may be apprised by virtue of FRANCHISEE's operation under the terms of this Agreement. FRANCHISEE shall divulge such confidential information only to such of its employees as must have access to it in order to operate the franchised business. Any and all information, knowledge, and know-how including, without limitation, drawings, materials, specifications, techniques, and other data, which FRANCHISOR designates confidential shall be deemed confidential for purposes of this Agreement. FRANCHISOR shall have the non-exclusive right to use and incorporate into FRANCHISOR's Systems, for the benefit of itself and other of FRANCHISOR's franchisees licensees and distributors, all modifications, changes, and improvements developed or discovered by FRANCHISEE or FRANCHISEE's employees or agents in connection with the franchised business, without any liability or obligation to the developer thereof.

8.2     The covenants contained in this Section 8 shall be construed as severable and independent and shall be interpreted and applied consistently with the requirements of reasonableness and equity. If all or any portion of a covenant in this Section 8 is held unreasonable or unenforceable by a court, arbitration panel or other agency having valid jurisdiction in a decision to which FRANCHISOR is a party, FRANCHISEE expressly agrees to be bound by any lesser covenant included within the terms of such greater covenant that imposes the maximum duty permitted by law, as if the lesser covenant were separately stated in, and made a part of, this Section 8.

8.3     FRANCHISEE acknowledges that FRANCHISOR shall have the right, in its sole discretion, to reduce the scope of any covenant set forth in this Section 8, or of any portion or portions thereof, without FRANCHISEE's consent, and FRANCHISEE agrees to comply forthwith with any covenant as modified.

-12-

## Section 9. Default

9.0    FRANCHISEE shall be in default under this Agreement:

9.0.1    If FRANCHISEE shall become insolvent or make an assignment for the benefit of creditors, or if a petition in bankruptcy is filed by FRANCHISEE, or if such a petition is filed against and consented to by FRANCHISEE or is not dismissed within thirty (30) days, or if FRANCHISEE is adjudicated a bankrupt, or if a bill in equity or other proceeding for the appointment of a receiver of FRANCHISEE or other custodian for FRANCHISEE's business or assets is filed and is consented to by FRANCHISEE or is not dismissed within thirty (30) days, or if a receiver or other custodian is appointed, or if proceedings for composition with creditors under any state or federal law should be instituted by or against FRANCHISEE, or if the real or personal property of FRANCHISEE shall be sold at levy thereupon by any sheriff, marshall or constable; or

9.0.2    If FRANCHISEE is convicted of or pleads guilty or "nolo contendere" to a felony, a crime involving moral turpitude, or any other crime or offense that FRANCHISOR believes is injurious to the System(s), the Proprietary Marks or the goodwill associated therewith, or if FRANCHISOR has proof that FRANCHISEE has committed such a felony, crime or offense; or

9.0.3    If FRANCHISEE permits the use of the Unit or Premises for any illegal or unauthorized purpose, including, without limitation, palming off or substitution of products under the Proprietary Marks or other marks of FRANCHISOR; or

9.0.4    If any other franchise agreement between FRANCHISEE and FRANCHISOR or any affiliated entity is terminated by reason of FRANCHISEE's default thereunder; or

9.0.5    If FRANCHISEE fails to pay, perform, observe or comply with any of FRANCHISEE's duties and obligations under this Agreement; or if FRANCHISEE fails to carry out in all respects its obligations under any Lease, mortgage, equipment Agreement, promissory note, conditional sales contract or other contract materially affecting the Unit, to which the FRANCHISEE is a party or by which FRANCHISEE is bound, whether or not FRANCHISOR is a party thereto.

9.1    **Thirty Day Cure Period.** Except as otherwise provided in this Section 9, FRANCHISEE shall have the right to cure FRANCHISEE's default under this Agreement within thirty (30) days after written notice of default from FRANCHISOR is delivered pursuant to paragraph 14 hereof. Notwithstanding the foregoing, the following lesser periods shall apply under the circumstances described:

9.1.1    **Seven Day Cure Period.** A seven (7) day cure period shall apply if FRANCHISEE fails, refuses, or neglects to pay when due to FRANCHISOR any moneys owing to FRANCHISOR or to any Fund, or if FRANCHISEE fails to maintain the insurance coverage set forth in subsection 5.3 of this Agreement.

9.1.2    **24 Hour Cure Period.** A twenty-four (24) hour cure period shall apply as provided in paragraph 6.1.3 to the violation of any law, regulation, order or Standard of FRANCHISOR relating to health, sanitation or safety; or if FRANCHISEE ceases to operate the Unit for a period of forty-eight (48) hours without the prior written consent of FRANCHISOR, provided, however, that if the Unit is abandoned, no cure period shall apply.

9.1.3    **Cure on Demand.** FRANCHISEE shall cure on demand all "hazardous situations" and remove and destroy on demand all "hazardous products" as set forth in paragraph 5.1.2.1 and shall cure any situation which poses an imminent risk to public health and safety as provided in subsection 6.1.

9.1.4    **No Cure Period.** No cure period shall be available if FRANCHISEE is in default under any paragraph designated 9.0.1 through 9.0.4 above; or if FRANCHISEE abandons the Unit; or if FRANCHISEE intentionally under-reports Gross sales, falsifies financial data or otherwise commits an act of fraud with respect to FRANCHISEE's acquisition of this Franchise or its rights or obligations under this Agreement; or if FRANCHISEE's Lease for the Unit is terminated due to FRANCHISEE's default thereunder. In addition, no cure period shall be available for any default if FRANCHISEE has received three (3) or more previous notices-to-cure for the same or a substantially similar default (whether or not FRANCHISEE has cured the same), within the immediately preceding twelve (12) month period.

9.2    **Statutory Cure Period.** If a statute in the state in which the Premises is located requires a cure period for the applicable default which is longer than any cure period specified in this Section 9, the statutory cure period shall apply.

9.3    **Late Fee, Interest and Costs.** If FRANCHISEE fails to cure a default within any applicable time period following notice set forth in subsection 9.1, or if this Agreement is terminated as a result of FRANCHISEE's default, FRANCHISEE shall pay to FRANCHISOR all damages, costs and expenses, including, without limitation, late fees, collection fees, interest at one and one-half percent (1.5%) per month, or the highest permissible rate, and reasonable investigation and attorneys' fees incurred by FRANCHISOR as a result of any such default or termination. All such interest, damages, costs and expenses may be included in and form part of the judgment awarded to FRANCHISOR in any proceedings brought by FRANCHISOR against FRANCHISEE.

9.4    **Termination.** If FRANCHISEE fails to cure any default within the applicable period following notice from FRANCHISOR, FRANCHISOR may, in addition to all other remedies at law or in equity or as otherwise set forth in this Agreement, immediately terminate this Agreement. Such termination shall be effective immediately upon receipt of a written notice of termination from FRANCHISOR. Notwithstanding the foregoing, this Agreement shall immediately terminate upon the occurrence of any event set forth in paragraphs 9.0.1 through 9.0.4 or paragraph 9.1.4, without notice or opportunity to cure or notice of termination. Upon any termination or expiration of this Agreement all right of FRANCHISEE to use the Proprietary Marks and the System(s) and to operate the Unit under the Proprietary Marks shall terminate and:

*General Terms and Conditions*

9.4.1    FRANCHISEE shall promptly pay FRANCHISOR all sums owing or accrued from FRANCHISEE to FRANCHISOR, the Fund, and any affiliated landlord entity, including interest and any damages, costs and expenses, including reasonable attorneys' fees, incurred by FRANCHISOR by reason of default on the part of FRANCHISEE; and

9.4.2    FRANCHISEE shall immediately cease to operate the Unit, and shall not thereafter, directly or indirectly, represent to the public or hold itself out as a present or former FRANCHISEE of FRANCHISOR; and

9.4.3    FRANCHISEE shall immediately and permanently cease to use, by advertising or in any other manner whatsoever, any feature or method associated with the System(s), any or all of the Proprietary Marks and any other trade secrets, confidential information, operating manuals, slogans, trade dress, signs, symbols or devices which are part of FRANCHISOR's System(s) or are otherwise used in connection with the operation of the Unit. FRANCHISEE agrees that any such unauthorized use or continued use after the termination of this Agreement shall constitute irreparable harm. Continued use by FRANCHISEE of FRANCHISOR's trademarks, trade names, Proprietary Marks, and service marks after termination of this Agreement shall constitute willful trademark infringement by FRANCHISEE; and

9.4.4    FRANCHISEE shall immediately return to FRANCHISOR all operating manuals, plans, specifications, and other materials in FRANCHISEE's possession containing information prepared by FRANCHISOR and relative to the operation of the Unit, and all copies thereof (all of which are acknowledged to be FRANCHISOR's property), and shall retain no copy or record of any of the foregoing, except FRANCHISEE's copy of this Agreement, any correspondence between the parties, and any other documents which FRANCHISEE reasonably needs for compliance with any provision of law; and

9.4.5    FRANCHISEE shall remove from the Premises and from any equipment, signs, trade fixtures, furnishings and other personal property (except as provided in paragraph 9.4.6 below) and return to FRANCHISOR, all of the Proprietary Marks or other indicia of FRANCHISOR, and shall disconnect, withdraw and/or terminate, within five (5) days after termination or expiration of this Agreement, any telephone listings and/or fictitious name registration containing any part of the Proprietary Marks. Upon FRANCHISOR's written demand, however, FRANCHISEE shall assign to FRANCHISOR, upon any termination, expiration or non-renewal of this Agreement, any telephone number used in the operation of the Unit if such number is listed in the directory using any of the Proprietary Marks. FRANCHISEE hereby appoints FRANCHISOR as its attorney-in-fact, in the name of FRANCHISEE, to do any act necessary to effect the intent of this paragraph; and

9.4.6.    FRANCHISEE shall, but only in the case of any early termination of this Agreement due to FRANCHISEE's default, sell to FRANCHISOR, at FRANCHISOR's election, any or all of the equipment, interior and exterior signs, trade fixtures, furnishings and other personal property of FRANCHISEE used in connection with the Unit (hereinafter collectively "Equipment"), at the purchase cost when originally installed in the Unit, less a depreciation deduction computed on a straight line basis over a ten (10) year useful life for the respective items (but in no event less than ten percent (10%) of the original purchase cost for such equipment, fixtures and furnishings). If FRANCHISEE owes a balance due on its purchase or financing of such Equipment, or if the same are otherwise subject to a lien or claim for any indebtedness, the amounts of such balance and/or indebtedness shall be deducted from the purchase price payable to FRANCHISEE. All sums of money due FRANCHISOR by FRANCHISEE may be offset against the purchase price payable to FRANCHISEE. Nothing contained herein, however, shall be construed to entitle FRANCHISEE to be released from liability for such unpaid balance or indebtedness, if any, in excess of the portion of the purchase price applied for payment of such debts; and

9.4.7    FRANCHISEE shall, at FRANCHISOR's option by notice to FRANCHISEE within thirty (30) days from the date of termination or expiration, assign to FRANCHISOR any interest which FRANCHISEE has in the Lease or any other Agreement related to the Premises. If FRANCHISOR does not elect to exercise its option to acquire the Lease, FRANCHISEE shall make such modifications or alterations to the Premises immediately upon termination or expiration of this Agreement as may be necessary to distinguish the appearance of the Premises from that of other units in the System(s), and shall make such specific additional changes thereto as FRANCHISOR may reasonably require for that purpose. In the event FRANCHISEE fails or refuses to comply with the requirements of this paragraph 9.4.7, FRANCHISOR shall have the right to enter upon the Premises, without being guilty of trespass or any other tort, for the purpose of making such changes as may be required, at the expense of FRANCHISEE, which expense FRANCHISEE agrees to pay upon demand; and

9.4.8    FRANCHISEE shall pay to FRANCHISOR all damages, costs and expenses, including, but not limited to, reasonable investigation and attorney's fees and other reasonable expenses and costs such as travel costs and payroll expenses for FRANCHISOR's employees, incurred in obtaining injunctive or other relief for the enforcement of any provisions of this Section 9; and

9.4.9    FRANCHISEE shall continue to comply with Section 8 of this Agreement, for the Post-Term Period specified therein. If FRANCHISEE begins to operate any other business wherever situated, FRANCHISEE shall not use, in connection with such other business or the promotion thereof, any reproduction, counterfeit, copy or colorable imitation of any of FRANCHISOR's Proprietary Marks or trade dress; and FRANCHISEE shall not utilize any designation of origin or description or representation which falsely suggests or represent an association or connection with FRANCHISOR whether or not constituting unfair competition.

9.5    Nothing in this Agreement shall preclude FRANCHISOR from seeking any remedy under federal or state law for willful trademark infringement, including, without limitation, injunctive relief. No right or remedy herein conferred upon or reserved to FRANCHISOR is exclusive of any other right or remedy herein, or by law or equity provided or permitted, but each shall be cumulative of every other right or remedy given hereunder. FRANCHISEE agrees that the existence of any claims against FRANCHISOR, whether or not arising from this Agreement, shall not constitute a defense to the enforcement by FRANCHISOR of any provision of this Agreement.

-14-

9.6    Because the Unit is one of many units within the System(s) that sell similar products and services to the public, FRANCHISEE agrees that its failure to comply with the terms of this Agreement would cause irreparable damage to FRANCHISOR and the System(s) as a whole for which no adequate remedy at law may be available, including, without limitation, violations of standards, unhealthy, unsafe or unsanitary conditions, unauthorized use of the Proprietary Marks and breaches under Section 8 hereof. In the event of FRANCHISEE's breach or threatened breach of any of the terms of this Agreement, FRANCHISOR shall therefore be forthwith entitled to an injunction restraining such breach and/or to a decree of specific performance, without showing or proving any actual damage or irreparable harm or lack of an adequate remedy at law, and without the requirement for the posting of bond, the same being hereby waived by FRANCHISEE, until a final determination is made by a court of competent jurisdiction. The foregoing remedy shall be in addition to all other remedies or rights which FRANCHISOR might otherwise have by virtue of any breach of this Agreement by FRANCHISEE.

## Section 10. Transfer Provisions

10.0    **Transfer By FRANCHISOR.** This Agreement shall inure to the benefit of the successors and assigns of FRANCHISOR either individually or collectively. FRANCHISOR shall each have the right to assign its rights under this Agreement to any person, persons, partnership, association or corporation, provided that the transferee agrees in writing to assume all obligations undertaken by FRANCHISOR herein and FRANCHISEE receives a statement from both FRANCHISOR and its transferee to that effect. Upon such assignment and assumption, FRANCHISOR shall be under no further obligation hereunder except for accrued liabilities if any.

10.0.1    If this Agreement now or hereafter grants FRANCHISEE rights with respect to more than one (1) brand, FRANCHISOR shall have the right, at any time and from time to time, to require FRANCHISEE to execute and deliver separate contracts for each brand, each containing all of the terms of this Agreement pertaining to such brand. FRANCHISEE agrees to execute and return such replacement contracts to FRANCHISOR within thirty (30) days after receipt thereof. If FRANCHISEE fails to do so, FRANCHISOR shall have the right to execute such instruments on FRANCHISEE's behalf and deliver a copy thereof to FRANCHISEE.

10.1    **Transfer By FRANCHISEE.** FRANCHISEE understands and acknowledges that the rights and duties set forth in this Agreement are personal to FRANCHISEE and that FRANCHISOR has granted the Franchise in reliance on the business skill and experience, financial capacity and personal character of FRANCHISEE. Except as hereinafter provided, neither FRANCHISEE, nor any partner, if FRANCHISEE is a partnership, nor any member, if FRANCHISEE is a limited liability company ("LLC"), nor any shareholder, if FRANCHISEE is a corporation, without FRANCHISOR's prior written consent, shall, by operation of law or otherwise, sell, assign, transfer, convey, give away, pledge, mortgage or otherwise encumber to any person, persons, partnership, association, LLC or corporation, any interest in this Agreement, or any interest in the franchise granted hereby, or any interest in any proprietorship, partnership, LLC or corporation which owns any interest in the franchise, nor offer, permit or suffer the same. Any purported assignment or transfer not having the prior written consent of FRANCHISOR shall be null and void and shall constitute default hereunder. Any proposed transfer must meet all the requirements of FRANCHISOR including, but not limited to, those set forth in this Section 10.

10.2    **Consent By FRANCHISOR.** FRANCHISOR shall not unreasonably withhold its consent to any transfer referred to in paragraph 10.1 above, provided, that:

10.2.1    FRANCHISEE must have operated the Unit for a period of not less than six (6) months prior to the proposed transfer;

10.2.2    The sales price of the interest to be conveyed must not be so high, or the terms of sale so onerous, that, in the judgment of FRANCHISOR, the transferee will be unlikely to properly maintain, operate and promote the Unit and meet the transferee's financial and other obligations to FRANCHISOR, third party suppliers and creditors. This provision shall not create any liability to either transferor or transferee on the part of FRANCHISOR, in the event that FRANCHISOR approves the transfer and the transferee experiences financial difficulties;

10.2.3    The transferee and each partner, shareholder or member of the transferee, as the case may be, must be a United States citizen or lawful resident alien of the United States, must be of good moral character and reputation and must have a good credit rating and business qualifications and aptitude reasonably acceptable to FRANCHISOR. Such qualifications include, without limitation, literacy and fluency in the English language sufficient, in FRANCHISOR's opinion, to communicate with employees, customers, and suppliers of FRANCHISOR and to satisfactorily complete FRANCHISOR's required training program and such other tests and interviews as FRANCHISOR shall reasonably deem to be necessary or desirable. FRANCHISEE shall provide FRANCHISOR with such information as FRANCHISOR may require to make a determination concerning each proposed transferee; and

10.2.4    The transferee may not be a limited partnership, trust or other entity not specifically authorized herein.

10.3    **Transfer Requirements.** Each transfer of any interest in FRANCHISEE, the Unit, this Agreement and/or the Franchise herein granted, must receive the prior written consent of FRANCHISOR set forth in subsection 10.2 above and must conform to and/or comply with the following requirements:

10.3.1    Prior to the transfer, FRANCHISEE must pay and satisfy all accrued money obligations to FRANCHISOR, its affiliates and/or subsidiaries and to any Fund, obligations of FRANCHISEE which FRANCHISOR has guaranteed, liens, deferred rent and other obligations under the Lease for the Unit or other contracts pertaining to the Unit and the transfer fee provided below, as applicable;

*General Terms and Conditions*

10.3.2 Prior to the transfer, the Unit, including equipment, signs, building, improvements, interior and exterior, must be in good operating condition and repair and in compliance with FRANCHISOR's then-current Standards, including, without limitation, Standards for replacements and additions;

10.3.3 FRANCHISEE and any transferor may not assert any security interest, lien, claim or right now or hereafter in this Franchise, the Franchise granted to the transferee, or, if applicable, the Lease for the Unit with FRANCHISOR or its affiliated landlord entity. Any security interest, lien, claim or right asserted with respect to any personal property at the above location shall not include any after-acquired property and shall be subject, junior and subordinate to any security interest, lien, claim or right now or hereafter asserted by FRANCHISOR, its successors or assigns;

10.3.4 Prior to the transfer, the transferee must comply with the requirements of paragraph 5.1.8 of this Agreement, to the satisfaction of FRANCHISOR;

10.3.5 If the transferee is a corporation or LLC, it must comply with the terms of subsection 5.7 of this Agreement;

10.3.6 The transferee, including, where appropriate, all shareholders, members and partners of the transferee, shall jointly and severally execute, on FRANCHISOR's then-current forms, a franchise agreement and all other standard ancillary agreements, including, without limitation, a priority in payment agreement, if applicable. The priority in payment agreement provides, among other things, that if the transferee is unable at any time to make payments both to the transferor for the purchase of the Unit and to FRANCHISOR, its affiliates and/or subsidiaries and the Fund(s), payments to FRANCHISOR, its affiliates and/or subsidiaries and the Fund(s) will have priority. The transferee's franchise agreement shall not increase any fee based upon a percentage(s) of Gross Sales to a percentage greater than as required by this Agreement for the respective System(s). Unless a longer period is agreed upon between FRANCHISOR and the transferee, the term of the transferee's franchise agreement shall be for the unexpired term of this Agreement. The transferee shall pay no franchise fee pursuant to paragraph 4.1 of this Agreement unless a longer term is agreed upon by FRANCHISOR;

10.3.7 FRANCHISEE, including all individuals proposing to transfer an interest in the Franchise or the FRANCHISEE, must execute, on FRANCHISOR's standard form, a general release of all claims against the FRANCHISOR corporations, their affiliated corporations, and the directors, officers and employees of each; and

10.3.8 In addition, FRANCHISOR shall have the right to promulgate and enforce such additional reasonable requirements as it may, in its sole judgment determine.

10.4 **Transfer Fee.** The transferor shall pay to FRANCHISOR upon any transfer of any interest of FRANCHISEE in this Agreement or of any interest in the FRANCHISEE entity, a Transfer Fee determined as follows:

10.4.1 **Prior to FRANCHISEE's Fourth Year of Operations.** The transferor shall pay to FRANCHISOR a Transfer Fee which is the greater of: (i) five thousand dollars ($5,000.00), increased by five percent (5%) compounded annually during the term FRANCHISEE has operated the Unit under this or other agreements with FRANCHISOR; or (ii) five percent (5%) of the Adjusted Sales Price of the Unit.

10.4.1.1 The term "Adjusted Sales Price" shall mean the sales price to be received by FRANCHISEE upon transfer of the Unit, less the amount, if any, paid by FRANCHISEE for the Unit, when purchased as an ongoing business from another franchisee or from FRANCHISOR. No adjustment shall be made for amounts paid in connection with the development of a new unit. The Adjusted Sales Price shall include, without limitation, cash, assumption of debt, equipment lease obligations and deferred financing and amounts allocated to property of every kind, nature and description: furniture, fixtures, signs, equipment, supplies and inventory; excluding only amounts reasonably allocated to land and building, if owned by FRANCHISEE. It is intended that all consideration to be paid to FRANCHISEE, or for the benefit of FRANCHISEE, however designated and whether or not included in the contract of sale shall be deemed part of the Adjusted Sales Price including, but not by way of limitation, amounts allocated to a covenant not to compete or personal service agreement.

10.4.1.2 For purposes of determining the correct Transfer Fee, FRANCHISOR reserves the right to reallocate amounts which FRANCHISEE and the transferee have allocated to land, building, equipment, covenant against competition, personal service agreement, or otherwise, if in FRANCHISOR's opinion, the allocation of the parties is unreasonable in relation to the value of the business. If FRANCHISOR purchases the Unit from FRANCHISEE by exercise of its right of first refusal under paragraph 10.7, hereof, the Transfer Fee shall be payable by FRANCHISEE to FRANCHISOR as if FRANCHISEE had sold the franchised business to a third party.

10.4.2 **From and After FRANCHISEE's Fourth Year of Operations.** If the transfer takes place after the commencement of FRANCHISEE's fourth year of operations, the transferor shall pay to FRANCHISOR the Transfer Fee indicated below based on the Unit's Gross Sales for the most recently completed twelve (12) calendar month period preceding the date of the contract of sale. FRANCHISOR reserves the right to select another period or to make appropriate adjustments to such Gross Sales in the event extraordinary occurrences (e.g., road construction, fire or other casualty, etc.) materially affected Unit sales during the indicated twelve (12) month period.

| Sales for Most Recent 12 Month Period | Transfer Fee |
|---|---|
| Less than $400,000.00 | $5,000.00 |
| $400,000.00 or more, but less than $600,000.00 | $6,000.00 |
| $600,000.00 or more, but less than $1,000,000.00 | $8,000.00 |
| $1,000,000.00 or more, but less than $1,400,000.00 | $12,000.00 |
| $1,400,000.00 or more | $20,000.00 |

-16-

10.4.3 If FRANCHISOR purchases the Unit from FRANCHISEE by exercise of its right of first refusal under paragraph 10.7, hereof, the Transfer Fee shall be payable by FRANCHISEE to FRANCHISOR as if FRANCHISEE had sold the franchised business to a third party.

10.4.4 **Transfer of Less Than Control.** For any transfer that, either alone or together with other previous, simultaneous or proposed transfers, whether related or unrelated, will have the result of the transferee(s) holding an aggregate interest of less than fifty percent (50%) of the franchise licensed herein or the entity licensed hereunder, FRANCHISOR will reduce the Transfer Fee set forth in paragraph 10.4.1 or 10.4.2, as applicable, to a fixed transfer documentation fee of five hundred dollars ($500.00), increased after each five (5) years of the term of this Agreement, including any renewal period, by the same percentage as the Consumer Price Index (all cities average) published by the U.S. Department of Labor for the same period. FRANCHISOR will waive the Transfer Fee entirely with respect to a transfer of less than control, if each transferee was an approved party to (or personal guarantor of) this Agreement prior to transfer.

10.4.5 **Transfer to Spouse or Children.** Notwithstanding anything else contained in this subsection 10.4, but provided that FRANCHISOR determines that FRANCHISEE has been in full compliance with the terms of all agreements with FRANCHISOR and its affiliates, the Transfer Fee due in connection with a transfer of the Unit to FRANCHISEE's spouse or one or more of FRANCHISEE's children shall be the fixed transfer documentation fee described in paragraph 10.4.4 above. The franchise agreement issued to the spouse and/or children will be on the then-current form in use at the time of transfer including the then-current Transfer Fee provisions.

10.5 **Release of Transferor.** Upon FRANCHISOR's approval of the transfer and FRANCHISEE's compliance with the aforesaid conditions, the transferor shall, provided that the transferor no longer has an interest in the Franchise, thereupon be relieved of further obligations under the terms of this Agreement, except that the transferor shall remain obligated for FRANCHISEE's money obligations under Section 4 through the date of transfer, and under the covenants contained in Section 8 for the Post Term Period therein described, after the date of transfer.

10.6 **Transfer on Death, Disability or Incapacity.** In the event of the death, disability or mental incapacity of FRANCHISEE, or any partner, member or shareholder of FRANCHISEE, at any time during the term of this Agreement, the legal representative of the deceased, disabled or incapacitated party, as the case may be, together with all surviving partners, members or shareholders of FRANCHISEE, if any, shall, within six (6) months of such death, disability or mental incapacity, jointly apply, in writing to transfer the Franchise or the interest of the affected party in such Franchise, to such person or persons as the legal representative may specify. Such transfer shall be approved by FRANCHISOR upon fulfillment of all of the conditions set forth in Section 10 of this Agreement. A Transfer Fee shall be due pursuant to subsection 10.4 above, except that paragraph 10.4.5 shall apply if the transferee is a beneficiary or heir of FRANCHISEE.

10.6.1 If the legal representative and all surviving partners, members or shareholders, if any, do not propose a transferee acceptable to FRANCHISOR under the standards set forth in this Agreement within the period set forth in paragraph 10.6 above, or if no transfer of the interest shall have been accomplished consistent with the provisions of this Section 10 within one (1) year from the date of death, disability or mental incapacity, all rights licensed to FRANCHISEE under this Agreement shall terminate forthwith and automatically revert to FRANCHISOR. FRANCHISOR shall have the right and option, exercisable under such termination, to purchase all furniture, fixtures, signs, equipment and other chattels at a price to be agreed upon by the parties or, if no agreement as to price is reached by the parties, at such price as may be determined by a qualified appraiser, approved by both parties, such approval not to be unreasonably withheld. FRANCHISOR shall give notice of its intent to exercise said option no later than twenty-one (21) days prior to termination.

10.6.2 If the deceased, disabled or incapacitated party is the Designated Representative, then during the interim period until a transfer of the interest under this subsection 10.6 has taken place, the legal representative and surviving partners, members or shareholders shall operate the Unit through a successor Designated Representative who shall possess such qualifications for interim management of the Unit as FRANCHISOR may determine, in its discretion, from time to time. Failure of FRANCHISEE or the legal representative to appoint a Designated Representative so qualified within ninety (90) days after the date of death, disability or mental incapacity of the Designated Representative shall be grounds for FRANCHISOR to terminate this Agreement after sending FRANCHISEE a thirty (30) day written notice-to cure.

10.6.3 FRANCHISOR shall have the right to require a certified copy of an order of a court of competent jurisdiction over the estate of the deceased or incapacitated person, in which the legal representative or heir or legatee shall be determined, and may rely on such certified copy for the purposes of subsection 10.6. If not furnished with such certified copy of a court order, or in the event of a legal contest, FRANCHISOR may decline, without liability, to recognize the claim of a party to such interest. FRANCHISOR shall not be liable to any heir, next of kin, devisee, legatee, or legal representatives of a deceased or incapacitated person by reason of approval of a transfer of the interest to the surviving spouse or a child of the deceased, provided such approval is not contrary to an order of a court of competent jurisdiction served on FRANCHISOR.

10.7 **Right of First Refusal.** If FRANCHISEE, or any shareholder, member or partner thereof, has received and desires to accept a signed, bona fide written offer from a third party to purchase FRANCHISEE's rights under this Agreement or any shareholder's, member's or partner's interest in the franchised business, FRANCHISEE or such shareholder, member or partner shall notify FRANCHISOR and provide it with a complete copy of such offer. FRANCHISOR shall have the right and option, exercisable within sixty (60) days after its receipt of said copy, to purchase FRANCHISEE's Franchise, or such shareholder's, member's or partner's interest in the franchised business, on the same terms and conditions as offered by said third party. FRANCHISOR's exercise of its rights hereunder shall not relieve FRANCHISEE of its Transfer Fee obligation to FRANCHISOR. Should FRANCHISOR not exercise this option and the terms of the unaccepted offer be altered, FRANCHISOR shall, in each such instance, be notified of the changed offer and shall again have sixty (60) days to exercise its right to purchase on the altered terms. Should FRANCHISOR not exercise this option, all of the terms of Section 10 shall apply to the transfer.

*General Terms and Conditions*

## Section 11. Arbitration.

11.0     Except as otherwise specified in this Section 11, all controversies, claims or disputes between FRANCHISEE and FRANCHISOR of whatever kind or nature, whether arising out of or relating to the negotiation, performance or breach of this or any other agreement or otherwise, must be settled by arbitration administered by the American Arbitration Association ("AAA") under its Commercial Arbitration Rules, as herein modified. This provision encompasses all causes of action, whether nominally a "claim", "counterclaim" or "cross-claim", and whether arising under common law or any state or federal statute. As used in this Section 11, the terms "FRANCHISOR" and "FRANCHISEE" include, without limitation, the past and present employees, agents, representatives, officers, directors, shareholders, members, guarantors, sureties, parent corporations, subsidiary corporations, controlled affiliated entities, predecessors, successors and/or assigns of each party hereto. The parties intend that this provision be given the broadest possible interpretation by a court of law.

11.1     **Eligibility and Procedures.** Arbitration must be initiated within the lesser of the time periods (a) set forth in paragraph 11.7.5 below or (b) permitted under the applicable statute of limitations for the cause of action asserted. Any claim, controversy or dispute which is not so initiated within said lesser period shall not be eligible for arbitration under any circumstances. Arbitration shall be initiated as provided in the Rules of the AAA by the filing of a demand for arbitration with the regional office of the AAA located in the city and state inserted in Item "L" of the Contract Data Schedule of this agreement. If no location is inserted in Item "L" or if such insertion is incomplete or inaccurate, Boston, Massachusetts, shall be deemed to apply. The arbitration proceedings, including without limitation all conferences, preliminary and dispositive hearings shall be conducted in such city and state unless all parties agree to another venue. Actions to enforce an express obligation to pay moneys may be brought under the Expedited Procedures of the AAA's Commercial Arbitration Rules, provided there are no counterclaims. The arbitrator(s) may issue such orders for interim relief as may be deemed necessary to safeguard the rights of the parties during the arbitration, but without prejudice to the ultimate rights of the parties, to the final determination of the dispute or to the rights of the FRANCHISOR to seek equitable relief from a court of competent jurisdiction at any time, even during the pendency of any arbitration proceedings initiated hereunder.

11.2     **Enforceability and Effect.** Judgment on the award, including, without limitation, any interim award for interim relief, rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. The binding or preclusive effect of any award shall be limited to the actual dispute or claim arbitrated, and to the parties, and will have no collateral effect on any other dispute or claim of any kind whatsoever.

11.3     **Governing Law.** The Federal Arbitration Act and related federal judicial procedure shall govern this contract to the fullest extent possible, excluding all state arbitration law, irrespective of the location of the arbitration proceedings, the nature of the dispute between the parties or the nature of the court in which any related judicial proceedings may be brought. Except as provided in the preceding sentence respecting arbitration law, the resolution of all disputes between the parties bound hereunder, whether in tort and regardless of the place of injury or the place of the alleged wrongdoing or whether arising out of or relating to the parties' contractual relationship, shall be governed by the law of the Commonwealth of Massachusetts without regard to choice of law principles.

11.4     **Exceptions to Arbitration.** Disputes concerning the validity or scope of this Section 11 (arbitration), including, without limitation, whether a dispute is arbitrable hereunder, shall be beyond the authority of the arbitrator(s) and shall be determined by a court of competent jurisdiction pursuant to the Federal Arbitration Act, 9 U.S.C. §1 et seq., as amended from time to time. In addition, the causes of action specified in the following subsections 11.5 and 11.6 are the sole and exclusive exceptions to the agreement of the parties hereto to resolve disputes through arbitration:

11.5     **FRANCHISOR's Exceptions.** FRANCHISOR shall have the option to litigate any one or more of the causes of action specified in this subsection 11.5 and shall exercise said option by filing a complaint in any court of competent jurisdiction:

11.5.1   the enforcement of an obligation to pay money to FRANCHISOR under an express term of any agreement;

11.5.2   any action based upon an allegation of intentional underreporting of Gross Sales by FRANCHISEE;

11.5.3   any action for declaratory or equitable relief, including, without limitation, seeking of preliminary and/or permanent injunctive relief, specific performance, other relief in the nature of equity or any action at law for damage to FRANCHISOR's property or property interests or in equity to enjoin any harm or threat of harm to FRANCHISOR's goodwill, Proprietary Marks or its tangible or other intangible property, brought at any time, including, without limitation, prior to or during the pendency of any arbitration proceedings initiated hereunder;

11.5.4   any action seeking to terminate this Agreement based upon FRANCHISEE's material breach of paragraph 5.1.7 of this Agreement (excluding subparagraph 5.1.7.1); or

11.5.5   any action in ejectment or for possession of any interest in real or personal property.

11.6     **FRANCHISEE's Exceptions.** FRANCHISEE shall have the option to litigate any cause of action otherwise eligible for arbitration hereunder and shall exercise said option solely by filing a complaint in any court of competent jurisdiction in which FRANCHISEE expressly waives the right to a trial by jury and any and all claim(s) for punitive, multiple and/or exemplary damages. If any such complaint fails to include such express waivers or if any such court of competent jurisdiction determines that all or any part of such waivers shall be ineffective or void for any reason whatsoever, then the parties agree that the action shall thereupon be dismissed without prejudice, leaving the parties to their arbitration remedies, if then available pursuant to this Section 11.

-18-

11.6.1   In the event FRANCHISOR litigates any cause of action pursuant to subsection 11.5 above, FRANCHISEE shall not file any counterclaim, cross-claim, offset claim or the like against FRANCHISOR in the litigation, unless FRANCHISEE expressly waives the right to a trial by jury and any and all claim(s) for punitive, multiple and/or exemplary damages. Otherwise, FRANCHISEE shall submit each such counterclaim, cross-claim, offset claim or the like to arbitration, if then available pursuant to this Section 11.

11.7    **Waiver of Rights.** THE PARTIES HERETO AND EACH OF THEM KNOWINGLY, VOLUNTARILY AND INTENTIONALLY AGREE AS FOLLOWS:

11.7.1   The parties hereto and each of them EXPRESSLY WAIVE(S) THE RIGHT ANY MAY HAVE TO A TRIAL BY JURY; and

11.7.2   The parties hereto and each of them EXPRESSLY WAIVE(S) ANY CLAIM FOR PUNITIVE, MULTIPLE AND/OR EXEMPLARY DAMAGES, except that FRANCHISOR shall be free at any time hereunder to bring an action for willful trademark infringement and, if successful, to receive an award of multiple damages as provided by law; and

11.7.3   The parties hereto and each of them EXPRESSLY AGREE(S) THAT NO PARTY BOUND HEREBY MAY RECOVER DAMAGES FOR ECONOMIC LOSS ATTRIBUTABLE TO NEGLIGENT ACTS OR OMISSIONS EXCEPT FOR CONDUCT WHICH IS DETERMINED TO CONSTITUTE GROSS NEGLIGENCE OR AN INTENTIONAL WRONG; and

11.7.4   The parties hereto and each of them EXPRESSLY AGREES THAT IN THE EVENT OF ANY FINAL ADJUDICATION OR APPLICABLE ENACTMENT OF LAW THAT PUNITIVE, MULTIPLE AND/OR EXEMPLARY DAMAGES MAY NOT BE WAIVED, ANY RECOVERY BY ANY PARTY IN ANY FORUM SHALL NEVER EXCEED TWO (2) TIMES ACTUAL DAMAGES, except for an award of multiple damages to FRANCHISOR for willful trademark infringement, as provided by law.

11.7.5   ANY AND ALL CLAIMS AND ACTIONS ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE RELATIONSHIP OF FRANCHISEE AND FRANCHISOR OR FRANCHISEE'S OPERATION OF THE UNIT, BROUGHT IN ANY FORUM BY ANY PARTY HERETO AGAINST THE OTHER, MUST BE COMMENCED WITHIN TWO (2) YEARS AFTER THE DISCOVERY OF THE FACTS GIVING RISE TO SUCH CLAIM OR ACTION, OR SUCH CLAIM OR ACTION SHALL BE BARRED, EXCEPT FOR FINANCIAL OBLIGATIONS OF FRANCHISEE.

11.8    **No Class Actions.** No party shall initiate or participate in any class action litigation claim against any other party bound hereby, except that FRANCHISEE may initiate or participate in any class action arbitration claim by franchisees of FRANCHISOR against FRANCHISOR limited exclusively to alleged misappropriation of moneys from the Fund of any System authorized by this Agreement, which claim must be brought only in arbitration under the provisions of this Section 11.

11.9    **Post-Term Applicability.** The provisions of this Section 11 shall continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement, however effected.

## Miscellaneous Provisions.

12.0    **Relationship of the Parties.** This Agreement does not constitute FRANCHISEE an agent, legal representative, joint venturer, partner, employee or servant of FRANCHISOR or its affiliated corporation for any purpose whatsoever; and it is deemed understood between the parties hereto that FRANCHISEE shall be an independent contractor and is in no way authorized to make any contract, agreement, warranty or representation on behalf of FRANCHISOR or its affiliated corporation or to create any obligation, express or implied, on behalf of FRANCHISOR or its affiliated corporation. The parties agree that this Agreement does not create a fiduciary relationship between FRANCHISOR or its affiliated corporation and FRANCHISEE.

12.1    Under no circumstances shall FRANCHISOR or FRANCHISEE be liable for any act, omission, debt or other obligation of the other party. Each party shall indemnify, protect, defend and save the other party harmless against any such claim. The cost of defending against any claim arising directly or indirectly from, or as a result of, or in connection with FRANCHISEE's operation of the Unit shall be borne by FRANCHISEE.

13.0    **Non-Waiver.** Any failure of FRANCHISOR to exercise any power reserved to it hereunder, or to insist upon strict compliance by FRANCHISEE with any term, covenant or condition in this Agreement, and any waiver by FRANCHISOR of any breach of a term, covenant or condition shall not be deemed to be a waiver of such term, covenant or condition or any subsequent breach of the same or any other term, covenant or condition in this Agreement. Subsequent acceptance by FRANCHISOR of the payments due to it hereunder, in whole or in part, shall not be deemed to be a waiver by FRANCHISOR of any preceding breach by FRANCHISEE of any term, covenant or condition of this Agreement. FRANCHISOR may, in its sole discretion, waive or modify any obligation of other franchisees under agreements similar to this Agreement, and no such waiver or modification shall obligate FRANCHISOR to grant a similar waiver or modification to FRANCHISEE. Acceptance by FRANCHISOR of payments due under this Agreement from any other person or entity shall be deemed to be acceptance from such person or entity as an agent of FRANCHISEE and not as recognition of such person or entity as an assignee of or successor to FRANCHISEE.

14.0    **Notices.** All notices hereunder by FRANCHISOR to FRANCHISEE shall, at FRANCHISOR's option, be personally delivered or sent by telecopier, prepaid private courier or certified mail to the FRANCHISEE at the address set forth in Item "I" of the Contract Data Schedule of this Agreement or to such other address as FRANCHISEE may from

time to time give notice of to FRANCHISOR. If delivery is refused, proof of attempted delivery shall be deemed delivery. All notices hereunder by FRANCHISEE to FRANCHISOR shall be sent by certified mail to Allied Domecq Retailing USA, at Post Office Box 317, 14 Pacella Park Drive, Randolph, Massachusetts 02368. Attention: Senior Vice President and General Counsel or to such other address as FRANCHISOR may from time to time give notice to FRANCHISEE.

15.0    **Entire Agreement.** This Agreement, and the documents referred to herein shall be the entire, full and complete agreement between FRANCHISOR and FRANCHISEE concerning the subject matter hereof, and supersedes all prior agreements, no other representation having induced FRANCHISEE to execute this Agreement; and there are no representations, inducements, promises or agreements, oral or otherwise, between the parties not embodied herein, which are of any force or effect with reference to this Agreement or otherwise. No amendment, change or variance from this Agreement shall be binding on either party unless executed in writing. Captions, paragraph designations and section or subsection headings are included in this Agreement for convenience only, and in no way define, limit, construe or describe the scope or intent of the respective parts of this Agreement. The Special Terms and Conditions attached to this Agreement supplement the General Terms and Conditions and are intended to be additional thereto. In the event of any conflict between any provisions thereof, the provisions of the Special Terms and Conditions shall be deemed to prevail.

16.0    **Severability.** Each section, part, term and provision of this Agreement shall be considered severable, and if, for any reason, any section, part, term or provision herein is determined to be invalid and contrary to, or in conflict with, any existing or future law or regulation of a court or agency having valid jurisdiction, such shall not impair the operation or affect the remaining portions, sections, parts, terms or provisions of this Agreement, and the latter will continue to be given full force and effect and bind the parties hereto; and said invalid section, part, term or provision shall be deemed not to be a part of this Agreement.

17.0    **Applicable Law.** This Agreement shall be deemed to have been made in, and shall be interpreted, construed and governed by the laws of, the Commonwealth of Massachusetts. FRANCHISEE acknowledges that this Agreement is to be performed in part through services rendered to FRANCHISEE in Massachusetts.

18.0    **Independent Investigation.** THE PROSPECT FOR SUCCESS OF THE BUSINESS VENTURE UNDERTAKEN BY FRANCHISEE BY VIRTUE OF THIS AGREEMENT IS SPECULATIVE AND DEPENDS TO A MATERIAL EXTENT UPON FRANCHISEE'S CAPABILITY AS AN INDEPENDENT BUSINESS PERSON AND FRANCHISEE, AS WELL AS OTHER FACTORS. FRANCHISOR MAKES NO REPRESENTATIONS OR WARRANTIES AS TO THE POTENTIAL SUCCESS OF THE BUSINESS VENTURE UNDERTAKEN BY FRANCHISEE HEREBY. FRANCHISEE REPRESENTS AND WARRANTS THAT IT HAS ENTERED INTO THIS AGREEMENT AFTER MAKING INDEPENDENT INVESTIGATIONS OF FRANCHISOR'S BUSINESS, AND NOT IN RELIANCE UPON ANY REPRESENTATION AS TO SALES OR PROFITS WHICH FRANCHISEE IN PARTICULAR MIGHT BE EXPECTED TO REALIZE. FRANCHISEE FURTHER REPRESENTS AND WARRANTS THAT FRANCHISOR AND ITS REPRESENTATIVES, EMPLOYEES OR AGENTS HAVE MADE NO REPRESENTATIONS TO INDUCE FRANCHISEE TO ACQUIRE THIS FRANCHISE AND EXECUTE THIS AGREEMENT WHICH ARE NOT EXPRESSLY SET FORTH HEREIN OR IN THE DISCLOSURE MATERIALS PROVIDED TO FRANCHISEE PRIOR TO ENTERING INTO THIS AGREEMENT.

19.0    **FRANCHISEE acknowledges receiving a copy of this Agreement, the attachments thereto, and agreements relating thereto, if any, at least five (5) business days prior to the date on which this Agreement was executed. FRANCHISEE further acknowledges receiving, on the date of the first personal meeting between FRANCHISOR and FRANCHISEE and not less than ten (10) business days prior to the date on which this Agreement was executed, the disclosure documents required by the Trade Regulation Rule of the Federal Trade Commission entitled "Disclosure Requirements and Prohibitions Concerning Franchising and Business Opportunity Ventures".**

Initials

ALLIED DOMECQ QSR
RIDER TO FRANCHISE AGREEMENT

**SCHEDULE "DD"**
120102

### SPECIAL TERMS AND CONDITIONS APPLICABLE TO A
### DUNKIN' DONUTS FRANCHISE

In connection with its business and the business of its Dunkin' Donuts franchisees, DUNKIN' DONUTS has developed and used and continues to use and control the usage of certain proprietary interests, trademarks, logos, emblems and other indicia of origin, service marks and trade names, including *Dunkin' Donuts*®, which is registered as a trademark on the Principal Register of the United States Patent and Trademark Office (the "Proprietary Marks"), to identify for the public the source of goods and services marketed thereunder and to represent to the public high and uniform standards of quality, cleanliness, appearance and service.

FRANCHISEE, being cognizant of the distinctive and valuable significance to the public of all of the foregoing, desires to make use of the trademark *Dunkin' Donuts*®, and to enjoy the benefits of that mark, the other Proprietary Marks and the Dunkin' Donuts System.   FRANCHISEE understands the importance of FRANCHISOR's high and uniform standards of quality, cleanliness, appearance and service to the value of the Dunkin' Donuts System and the necessity of opening and operating FRANCHISEE's Dunkin' Donuts Unit in conformity with the Dunkin' Donuts System and in accordance with FRANCHISOR's Standards and specifications.

### DEFINITIONS

As used in these Special Terms and Conditions applicable to a Dunkin' Donuts Franchise, the following defined terms shall have the following meanings:

A.   The "Dunkin' Donuts Unit" means all or a portion of the Premises dedicated to the operation of the Dunkin' Donuts System, as approved by FRANCHISOR.

B.   "Dunkin' Donuts Products" shall mean and refer to donuts, bagels, muffins, cookies and other baked goods, sandwiches, coffee, soda, frozen drinks and other beverages, all of a variety of kinds or flavors, made in accordance with specifications designated by FRANCHISOR and identified by the Dunkin' Donuts Proprietary Marks, and such other products as may be specified from time to time in writing by FRANCHISOR for sale in the Dunkin' Donuts Unit.

C.   Where applicable, the "Producing Unit" for this Dunkin' Donuts Unit is the Dunkin' Donuts manufacturing unit designated in Item "M" of the Contract Data Schedule of this Agreement.

### Section DD-1.  Grant Of The Franchise

1.0    FRANCHISOR grants to FRANCHISEE for and during the term hereof and FRANCHISEE accepts a Franchise to operate a donut shop utilizing the Dunkin' Donuts System in accordance with the terms, covenants and conditions of this agreement, at one location only, the Premises described in Item "A" of the Contract Data Schedule of this agreement (hereinafter called the "Dunkin' Donuts Unit").  In connection therewith, this Franchise includes the right to use at the Dunkin' Donuts Unit only, the trademark *Dunkin' Donuts*®, along with other Proprietary Marks owned and utilized by DUNKIN' DONUTS in connection with other Dunkin' Donuts units, and the right to use at the Unit only, the Dunkin' Donuts System including confidential and valuable information which now exists or may be acquired hereafter and set forth in FRANCHISOR's manuals or as otherwise from time to time disclosed to Dunkin' Donuts franchisees.

### Section DD-2.  Scope Of The Franchise

2.0   This Dunkin' Donuts Franchise is specific to one location only, for the term of this Agreement.  It grants no rights outside the Premises, nor includes any territorial protection against competition.  FRANCHISOR reserves and retains the right to operate or permit others to operate Dunkin' Donuts units or to sell or distribute Dunkin' Donuts products and/or services or to otherwise use the Dunkin' Donuts Proprietary Marks and/or the Dunkin' Donuts System, in each case at any other location. FRANCHISOR and other franchisees may compete for customers drawn from the same area as FRANCHISEE's Dunkin' Donuts Unit using the same or different brand(s).

### Section DD-3.  Advertising and Promotion

3.0   FRANCHISOR shall prepare and coordinate a "Start-Up" promotional program (or such other promotional or advertising program as FRANCHISOR may specify) for the initial opening of the Dunkin' Donuts Unit.

3.1    FRANCHISOR shall review for approval all proposed advertising and promotional materials prepared by FRANCHISEE for use in local advertising relating to the Dunkin' Donuts Unit; and

3.3.1  FRANCHISOR shall administer The Dunkin' Donuts Advertising and Sales Promotion Fund (the "Dunkin' Donuts Fund") and shall direct the development of all advertising, marketing and promotional programs for the Dunkin' Donuts System.  That portion of FRANCHISEE's payments under paragraph 4.4  of this Agreement equal to one percent (1%) of the Gross Sales of the Dunkin' Donuts Unit will be utilized, at the discretion of FRANCHISOR, to provide for the administrative expenses of the Dunkin' Donuts Fund and for programs designed to increase sales and enhance and further develop the public reputation and image of DUNKIN' DONUTS and the Dunkin' Donuts System.  The balance, including any interest earned by the Dunkin' Donuts Fund, will be used for advertising and related expenses.  Contributions to the Dunkin' Donuts Fund in excess of the percentage of Gross Sales of the Dunkin' Donuts Unit set forth in Item "F" of the Contract Data Schedule shall be used in accordance with the programs to which they relate.

*Dunkin' Donuts Rider - pg.* 1

### Section DD-4. Payments

4.4 FRANCHISEE shall make payments to the Dunkin' Donuts Fund as described in paragraph 4.4 of the General Terms and Conditions, except that sales to wholesale accounts approved by FRANCHISOR are excluded for purposes of calculating fees due under paragraph 4.4 (only). For wholesale accounts to be approved by FRANCHISOR, FRANCHISEE must provide FRANCHISOR prior written notice of each such account. Upon FRANCHISOR's receipt of such notice, the account shall be deemed approved, unless FRANCHISOR at any time notifies FRANCHISEE in writing that such account is not approved. FRANCHISEE shall, within ten (10) days of receipt of a disapproval notice, discontinue sales to the disapproved wholesale account.

4.4.1 FRANCHISOR reserves the right in its sole and absolute discretion to designate or change the composition of Dunkin' Donuts Units included in the base for purposes of determining "two-thirds" support.

### Section DD-5. Covenants of FRANCHISEE

5.0 FRANCHISEE understands and acknowledges that every detail of the Dunkin' Donuts System is important to DUNKIN' DONUTS, to FRANCHISEE and to other Dunkin' Donuts franchisees, in order to maintain high and uniform standards of quality, cleanliness, appearance, service, products and procedures and thereby increase the demand for Dunkin' Donuts Products and protect and enhance the reputation and goodwill of DUNKIN' DONUTS.

5.1 Unless this Unit is expressly authorized to manufacture donut products on the Premises, and except as DUNKIN' DONUTS may otherwise authorize and direct in writing, donut products sold at this Unit shall be produced in the Dunkin' Donuts manufacturing unit located at the address set forth in Item "M" of the Contract Data Schedule of this Agreement (the "Producing Unit").

5.1.5.1 Franchisees' cooperatively-owned distribution centers under the Distributor Commitment Program ("DCP") are currently approved by DUNKIN' DONUTS to supply franchisees with a variety of ingredients, supplies and equipment. DUNKIN' DONUTS or an affiliated company may from time to time be among the approved suppliers of products, supplies, services, equipment and/or materials required for the operation of the Dunkin' Donuts Unit. If any such party is designated an approved supplier, it will be subject to the same competitive bidding procedure as other suppliers of the same Dunkin' Donuts Products.

5.1.5.2 DUNKIN' DONUTS may, from time to time, enter into national or regional exclusive supply arrangements with one or more independent suppliers for designated Dunkin' Donuts Products. In evaluating the need for an exclusive supplier, DUNKIN' DONUTS may take into account (without limitation) the uniqueness of the designated Dunkin' Donuts Products, the projected price and required volume of such Dunkin' Donuts Products, the investment required of a supplier in order to meet the needs for such Dunkin' Donuts Products, the supplier's ability to provide such Dunkin' Donuts Products, the lack of availability of qualified alternative suppliers, the duration of exclusivity, the desirability of competitive bidding and such other business considerations as may be relevant.

5.2.1 Sales to approved wholesale accounts must be separately designated as "wholesale" on Gross Sales reports required under paragraph 5.2.1 of the General Terms and Conditions of this Agreement.

5.2.5 FRANCHISEE's Records shall also include, without limitation, daily production, throwaway and finishing records, and records of all wholesale accounts.

### Section DD-7. Proprietary Marks

7.0 FRANCHISEE acknowledges and agrees that *Dunkin' Donuts*® is a registered trademark owned or controlled by DUNKIN' DONUTS; that said mark has been and is being used by DUNKIN' DONUTS and by its franchisees and licensees; that said mark, together with the other Proprietary Marks presently owned or controlled by DUNKIN' DONUTS or which may be acquired in the future, constitutes part of the Dunkin' Donuts System; that valuable goodwill is associated with and attached to said mark and the other Dunkin' Donuts Proprietary Marks; and that any and all goodwill associated with the Dunkin' Donuts Proprietary Marks, including any goodwill which might be deemed to have arisen through FRANCHISEE's activities, inures directly and exclusively to the benefit of DUNKIN' DONUTS.

7.5 FRANCHISEE shall operate, advertise and promote the Dunkin' Donuts Unit under the name "Dunkin' Donuts", with no accompanying words or symbols of any nature, except as may be otherwise required by law. FRANCHISEE shall not use, as part of its corporate or other business name, any Proprietary Marks used by FRANCHISOR, including, but not limited to, "Dunkin' Donuts" or "Dunkin", or any form or variations thereof, including, but not limited to, "Dunk" or "D.D.", which, in the judgment of FRANCHISOR, is likely to cause third parties to be confused or mistaken with respect to the separate identities of DUNKIN' DONUTS and FRANCHISEE.

Initials

## SPECIAL TERMS AND CONDITIONS APPLICABLE TO
## DEVELOPMENT OF A NEW UNIT BY FRANCHISEE

FRANCHISEE wishes to develop a new Unit that will utilize one or more of FRANCHISOR's Proprietary Marks at the Premises. In order to facilitate FRANCHISEE's obtaining financing and other needed resources, FRANCHISOR may elect to enter into this agreement prior to having had the opportunity to review the Premises to determine if it is suitable for development as such a Unit. FRANCHISEE's right to develop and operate a Unit under the terms of this agreement at the Premises is, therefore, subject to the conditions that 7(i) FRANCHISOR shall approve the Premises as a suitable location for development of a Unit and (ii) FRANCHISOR shall determine that FRANCHISEE meets all of FRANCHISOR's qualifications and requirements for new, or if appropriate multiple-unit, franchisees. This Schedule enumerates the respective responsibilities of the parties pertaining to FRANCHISEE undertaking to develop a Unit on the Premises. In consideration of a conditional grant to FRANCHISEE of one or more franchise(s) for the Premises, FRANCHISEE hereby agrees as follows:

1.0 **Approval of the Premises** - Development of the Premises as a Unit must be approved by FRANCHISOR, as evidenced solely by written notice sent to FRANCHISEE by the General Manager or other duly authorized representative of FRANCHISOR (the "Site Approval Notice") pursuant to the process hereinafter described. Any real estate commitments that FRANCHISEE may make pursuant to this agreement **MUST** be subject to: (a) FRANCHISEE having obtained FRANCHISOR's prior written approval of development of a Unit on the Premises; (b) FRANCHISEE obtaining all necessary permits, licenses and local governmental approvals needed to develop and operate a Unit on the Premises. In addition, FRANCHISEE should include such other contingencies as FRANCHISEE's attorney may recommend. FRANCHISEE must provide FRANCHISOR a copy of any lease of the Premises within ten (10) days after its execution and receipt by FRANCHISEE.

1.1 It shall be FRANCHISEE's responsibility to retain an attorney and other appropriate, independent advisors in connection with negotiating FRANCHISEE's acquisition of the right to develop and operate a Unit on the Premises, including reviewing all agreements with FRANCHISOR. FRANCHISOR assumes no liability or obligation to FRANCHISEE or to any third party for any assistance in negotiation FRANCHISOR may elect to provide to FRANCHISEE. Although FRANCHISOR may comment on FRANCHISEE's negotiations with third parties, any assistance FRANCHISOR provides to FRANCHISEE is no substitute for the advice of independent counsel. FRANCHISOR will not act as agent, employee or fiduciary of FRANCHISEE for the purpose of assisting FRANCHISEE in negotiations.

1.2 In the event that development of a Unit on the Premises is disapproved by FRANCHISOR or by any governmental authority, this Franchise agreement and all of the parties' rights and obligations hereunder shall cease and be of no further force and effect.

1.3 FRANCHISOR's approval of the Premises is not a representation or a warranty that the Unit will be profitable or that FRANCHISEE will achieve any particular level of sales at the Unit. It merely means that the Premises has met certain minimum criteria which FRANCHISOR has established for identifying suitable sites for proposed Units in the region in which the Premises are located. Because unit development is not a precise science, FRANCHISEE agrees that FRANCHISOR's approval or disapproval of a development shall not impose any liability or obligation on FRANCHISOR. The decision to develop any particular Premises is FRANCHISEE's, subject to FRANCHISOR's final approval. A preliminary favorable opinion of the Premises by local or regional representatives of FRANCHISOR is not conclusive or binding approval, because their recommendations may be rejected by FRANCHISOR.

2.0 **Approval of FRANCHISEE** - In addition to approval of the Premises set forth above, FRANCHISEE's qualifications to obtain this Franchise must be approved in writing by FRANCHISOR. In the event FRANCHISOR disapproves FRANCHISEE's qualifications within sixty (60) days of the date of this agreement, this Franchise agreement and all of the parties' rights and obligations hereunder shall cease and expire.

3.0 **Execution of Documents** - FRANCHISEE shall execute such other documents and agreements as are customarily required by FRANCHISOR in such circumstances, including, if appropriate, but not limited to, a standard form of Lease Option Agreement or Rider to Lease, which ensures the continued availability of the Premises as a franchised unit, in the event of a default under this agreement or, if applicable, under FRANCHISEE's lease of the Premises, during the term of this agreement. If FRANCHISEE owns the Premises real estate, FRANCHISEE shall grant FRANCHISOR the right to lease the Premises on negotiated terms comparable to those under which FRANCHISOR leases comparable property from others. A Lease Option Agreement or a Rider to Lease confirming these rights in a form acceptable to FRANCHISOR, must be signed before construction commences on the Premises.

4.0 **Development of the Unit** - The Unit must be developed and constructed in strict accordance with FRANCHISOR's current standards, requirements, procedures, plans, specifications and documentation for the type, configuration and brand(s) approved for the Premises (hereinafter collectively the "Requirements"). In order that development of the Premises proceed as expeditiously as possible, FRANCHISEE shall strictly comply with the following procedures set forth in Sections 4 and 5:

4.1 FRANCHISEE shall request FRANCHISOR's review of a proposed site, submitted in writing on the proscribed form, signed by FRANCHISEE and, if applicable, FRANCHISEE's landlord (the "Request for Site

*Schedule "F/D"*

Approval" ).   Within approximately thirty (30) days, FRANCHISOR will advise FRANCHISEE if the proposed Premises fails to meet FRANCHISOR's minimum preliminary criteria.  Otherwise, FRANCHISOR will schedule a Responsibility Meeting (described below), to be held within approximately sixty (60) days after FRANCHISOR received the Request for Site Approval.  This preliminary review procedure is intended to allow FRANCHISEE the opportunity to limit the amount of money FRANCHISEE spends on a site that does not meet FRANCHISOR's minimum criteria.

4.2   Once FRANCHISOR has scheduled a Responsibility Meeting, FRANCHISEE shall promptly hire a licensed architect for the Unit project, whose responsibility shall be to adapt FRANCHISOR's generic plans and/or specifications to the specific requirements of the Premises, the geographical region in which the Premises are located and the building codes and ordinances pertinent to the Premises, and to oversee the contractor's completion of construction of the Unit on the Premises.  FRANCHISEE's architect must promptly order such topographical and boundary surveys of the Premises, soil borings and structural engineering tests as FRANCHISOR and/or FRANCHISEE's architect may require (the "Reports").  FRANCHISEE's architect must attend the Responsibility Meeting.

4.3   On the scheduled day, FRANCHISOR's representatives will meet at the Premises with FRANCHISEE and FRANCHISEE's architect, to establish a work schedule and coordinate the respective responsibilities of each of the parties with respect to development of a Unit on the Premises (the "Responsibility Meeting").  The Reports, including copies of zoning ordinances and by-laws applicable to the Premises, shall be made available to FRANCHISOR at the Responsibility Meeting by FRANCHISEE's architect.  If any such Report or FRANCHISEE's architect is not available when required, FRANCHISOR may, at its option, postpone the Responsibility Meeting, in which case FRANCHISEE shall reimburse FRANCHISOR's out-of-pocket travel costs, if any.  Should the Responsibility Meeting be so postponed, FRANCHISOR shall reschedule the Responsibility Meeting on a date FRANCHISEE makes a firm commitment that the architect and/or Reports will be available, no later than within thirty (30) additional days.  If FRANCHISEE is unable to comply, FRANCHISOR shall have the right to terminate this Franchise agreement, provided that, in FRANCHISOR's good faith judgement, FRANCHISEE has failed to exercise reasonable diligence to comply with the terms of this Schedule.

4.4   Subject to delays caused by FRANCHISEE or its landlord or otherwise beyond FRANCHISOR's reasonable control, FRANCHISOR shall use its best efforts to notify FRANCHISEE of its approval or disapproval of the Premises, within approximately ninety (90) days after the date FRANCHISOR received FRANCHISEE's Request for Site Approval.

4.5   FRANCHISOR assumes no responsibility for (a) evaluation of the soil or subsoil on the Premises for hazardous substances or unstable conditions, (b) inspection of any structure on the Premises for asbestos or other toxic or hazardous materials, or (c) compliance with the Americans With Disabilities Act ("ADA").  It is FRANCHISEE's sole responsibility to obtain satisfactory evidence and/or assurances that the Premises (and any structures thereon) are free from environmental contamination and in compliance with the requirements of ADA.

5.0   **Construction of the Unit** -Prior to commencement of construction of the Unit on the Premises, the plans and specifications prepared by FRANCHISEE's architect must be reviewed by FRANCHISOR and approved for compliance with FRANCHISOR's design Requirements.  FRANCHISEE is solely responsible for obtaining all necessary permits from all applicable governmental agencies for completing construction of the Unit.  If FRANCHISE fails to commence construction of the Unit within twelve (12) months from the date of this Franchise Agreement, FRANCHISOR shall have the right, in its sole discretion, to terminate this agreement by written notice to FRANCHISEE.

5.1   FRANCHISEE and its contractor(s) shall obtain a comprehensive general liability insurance policy written by an insurer having at least a rating of A-XII in Best's Insurance Reports and in which FRANCHISOR is named as an additional insured party, Such policy shall comply with Subsection 5.3 of the General Terms and Conditions of this Franchise Agreement.  Coverage under such insurance shall include operations, premises liability, independent contractor's coverage, contractual liability and automobile liability (owned and non-owned).  Prior to commencement of construction, FRANCHISEE shall furnish FRANCHISOR an insurance certificate evidencing the foregoing policy and that FRANCHISEE or its contractor(s) have procured worker's compensation insurance covering all persons employed in construction of the Unit.

5.2   FRANCHISOR shall have the right of entry upon the Premises at all times, to inspect construction in progress, to ensure that all of FRANCHISOR's Requirements are being met.  FRANCHISOR and its employees shall not act as an architect or agent of FRANCHISEE.  The duties of FRANCHISOR's construction representative are limited solely to ensuring that FRANCHISOR's Requirements are met on the Premises.  FRANCHISEE shall not rely upon any opinions expressed by FRANCHISOR or any of its employees or agents regarding structural integrity, safety or construction procedures, building codes or ordinances or other matters properly within the responsibility of FRANCHISEE's architect.  FRANCHISOR assumes no liability or responsibility for architectural or engineering judgments outside the scope of the duties stated above.

5.3   If the Unit does not initially open to serve the general public within fifteen (15) months from the date of this agreement, FRANCHISOR shall have the right, in its sole discretion, (a) to increase the Initial Franchise Fee(s) to the then-current initial franchise fee(s), which increase, if any, shall be payable to FRANCHISOR upon demand; or (b) to terminate this agreement by written notice to FRANCHISEE.  In the event of any delay caused by FRANCHISOR, or if FRANCHISEE has been unavoidably delayed by act of God, government restrictions, labor difficulties, inability to obtain building materials or similar contingencies (other than making any payment) not within FRANCHISEE's control, FRANCHISOR shall extend the deadline for a period of time equal to the period of such unavoidable delay.

*Schedule "F/D"*

5.4  Before the Unit opens to serve the general public, FRANCHISEE must obtain FRANCHISOR's final approval of the construction of the building, site improvements and landscaping, as appropriate, and the installation of all signs and equipment. FRANCHISOR's approval of construction of the unit is not a representation or warranty that the Unit has been constructed in accordance with any architectural, engineering or legal standards for design or workmanship. It merely means that FRANCHISOR is satisfied that the Requirements which FRANCHISOR has established for consistency of design and layout have been met (or waived, where appropriate). FRANCHISEE agrees that FRANCHISOR's approval of construction of the Unit shall not impose any liability or obligation on FRANCHISOR. FRANCHISEE also agrees that all franchise and real estate documentation must be complete and all required payments must be received by FRANCHISOR before the Unit is opened.

5.5  As soon as FRANCHISOR approves that construction and equipping the Unit are substantially complete and all conditions required for opening the Unit have been met, FRANCHISEE shall promptly open the Unit to serve the general public. FRANCHISEE agrees that the Unit must open to serve the general public no later than fifteen (15) months from the date of this Agreement.

6.0  **Financing** - Prior to commencing construction of the Unit on the Premises, FRANCHISEE shall provide evidence satisfactory to FRANCHISOR that cash and/or financing is in place, sufficient to fund completion of construction and purchase of necessary improvements, equipment and signs. FRANCHISOR assumes no obligation to guarantee the funding or financing of FRANCHISEE's construction project. FRANCHISOR will not guarantee FRANCHISEE's mortgage, lease or other real estate related obligations. If FRANCHISOR, at its election, finances or guarantees the financing of FRANCHISEE's purchase or leasing of equipment and/or signs, the owner of the Premises real estate must agree that the equipment and signs are not a part of the realty and must waive any and all interest in the equipment and/or signs, in order to permit the financing of the equipment and/or signs. In this connection, the owner of the Premises real estate must sign such reasonable documents as are reasonably required by FRANCHISOR.

7.0  **Control of the Premises** - FRANCHISEE hereby represents to FRANCHISOR that FRANCHISEE will have the following relationship with the owner or lessor of the Premises (place an "x" in the appropriate box):

☒  the Premises will be owned by an independent third party landlord with which FRANCHISEE will not share or maintain any common partner, member, shareholder, officer, director, trustee, beneficiary, family member or other interest; or

☐  the Premises will be owned by a third party landlord with which FRANCHISEE will share or maintain a common partner, member, shareholder, officer, director, trustee, beneficiary, family member or other interest; or

☐  the Premises will be owned by a corporation, LLC, trust, partnership or other entity controlled by FRANCHISEE; or

☐  the Premises will be owned by the same entity that will execute the Franchise Agreement.

FRANCHISEE agrees to promptly advise FRANCHISOR of any change, whatsoever, in the relationship represented above.

Initials:

120199

SCHEDULE "NY"

### ADDENDUM TO THE ADQSR FRANCHISE AGREEMENT AND
### STORE DEVELOPMENT AGREEMENT
### REQUIRED BY THE NEW YORK GENERAL BUSINESS LAW

Notwithstanding anything to the contrary set forth in the ADQSR Franchise Agreement (the "Franchise Agreement") and/or the Store Development Agreement ("SDA") the following provisions shall supersede and apply to all Baskin-Robbins, Dunkin' Donuts and Togo's franchises offered and sold in the State of New York.

1.    Subsection 5.4 of the Franchise Agreement and Section 14 of the SDA shall each be supplemented by the addition of the following language as the last sentence of these sections:

However, FRANCHISEE shall not be required to indemnify FRANCHISOR for any claims arising out of a breach of this Agreement by FRANCHISOR or other civil wrongs of FRANCHISOR.

2.    Paragraph 7.4 of the Franchise Agreement shall be supplemented by adding thereto the following provisions:

FRANCHISEE must notify FRANCHISOR immediately in writing of any apparent infringement of or challenge to FRANCHISEE's use of any Mark, or claim by any person of any rights in any Mark or any similar trade name, trademark or service mark of which FRANCHISEE becomes aware. FRANCHISEE may not communicate with any person other than FRANCHISOR and its counsel in connection with any such infringement, challenge or claim. FRANCHISOR shall have sole discretion to take such action as it deems appropriate and the right to exclusively control any litigation, U.S. Patent and Trademark Office proceedings or other administrative proceeding or to otherwise protect and maintain its interest in the Marks. FRANCHISOR shall not be obligated to defend the FRANCHISEE against the claim of a third party that the operation of Retail Unit or the FRANCHISEE's use of the Marks infringes any right of the third party and FRANCHISOR shall not be obligated to protect, indemnify or hold harmless the FRANCHISEE from the consequences of any such claim or litigation. In the event FRANCHISOR does not take action, FRANCHISEE will have to protect itself at its own expense.

3.    Paragraph 10.3.7 of the Franchise Agreement shall be supplemented by adding thereto the following provisions:

FRANCHISEE must execute a general release in a form satisfactory to FRANCHISOR, releasing FRANCHISOR, its shareholders, directors, officers, employees, in their corporate and individual capacities, of any claims FRANCHISEE may have against them; provided, however, that all rights enjoyed by FRANCHISEE and any causes of action arising in its favor from the provision of Article 33 of the General Business Law of the State of New York and the regulations issued thereunder shall remain in force, it being the intent of this proviso that the non-waiver provisions of the New York State General Business Law Sections 687.4 and 687.5 be satisfied.

4.    Paragraph 10.1 of the Franchise Agreement shall be supplemented by adding thereto the following provisions:

This Agreement is fully assignable by FRANCHISOR and shall inure to the benefit of any assignee or other legal successor to the interest of FRANCHISOR herein. However, no assignment shall be made except to an assignee who, in the good faith judgment of FRANCHISOR, is willing and able to assume FRANCHISOR's obligations under this Agreement.

Initials

DUNKIN' DON.   ,

## PRODUCT SUPPLIER CONSENT AGREEMENT

**FOR SUPPLIER SHOP ("Supplier Franchisee") AND SUPPLIED SHOP ("Supplied Franchisee")**

Supplier Franchisee Shop Address: <u>Route 46 & Bergen Blvd., Fort Lee, New Jersey</u>   PC# <u>336078</u>

Supplied Franchisee Shop Address: <u>1773 Lexington Avenue, New York, New York</u>   PC# <u>339380</u>

Date: _____ 4-15-04

### RECITALS

This Agreement sets forth the terms and conditions on which Dunkin' Donuts Incorporated and its rental subsidiary (if the Supplier Franchisee or Supplied Franchisee leases its Shop from such subsidiary) (collectively "Dunkin' Donuts") will approve the Supplier Franchisee as the designated supplier of Dunkin' Donuts bakery products ("Supplied Products") to the Supplied Franchisee in accordance with a Product Supplier Agreement entered into by the parties. A copy of the Product Supplier Agreement is attached and incorporated herein by reference.

### AGREEMENT

1. CONSENT OF DUNKIN' DONUTS. Dunkin' Donuts hereby approves the Supplier Franchisee as the designated supplier of Dunkin' Donuts bakery products to the Supplied Franchisee's Shop. The Supplier Franchisee and the Supplied Franchisee agree to comply with the Product Supplier Agreement and this Agreement. The Supplier Franchisee will not commence deliveries to the Supplied Franchisee until all documents required by Dunkin' Donuts are fully executed and the Supplied Franchisee is approved or has been approved by Dunkin' Donuts to open the Dunkin' Donuts Shop. Failure of the Supplier Franchisee to comply with the Supplier Franchise Agreement shall be deemed a breach of this Agreement and the Supplier's Franchise Agreement and lease, if applicable. Failure of the Supplied Franchisee to comply with the Product Supplier Agreement shall be deemed a breach of this Agreement and the Supplied Franchisee's Franchise Agreement and lease, if applicable.

2. SUPPLIER'S FRANCHISE AGREEMENT. For the term of the Product Supplier Agreement, Supplier Franchisee's sales of bakery products to the Supplied Franchisee will not be included in the GROSS SALES of the Supplier Franchisee's Dunkin' Donuts Shop, for purposes of payments of Continuing Franchise Fees and Advertising Fees under the Supplier Franchisee's Franchise Agreement. Such sales are subject, however, to all record keeping, reporting and all other requirements of the Supplier Franchisee's Franchise Agreement and lease, if applicable.

3. SUPPLIER'S LEASE. For the term of the Product Supplier Agreement, Supplier Franchisee's sales of bakery products to the Supplied Franchisee will not be included in determining the Supplier Franchisee's Percentage Rent to Dunkin' Donuts under its lease with Dunkin' Donuts, if any. However, if Dunkin' Donuts, under its Prime Lease (if any) or otherwise, is required to pay Percentage Rent or other charges to a third party by reason of such sales, the Supplier Franchisee will pay to Dunkin' Donuts, when and as Dunkin' Donuts may specify, amounts equal to the Percentage Rent or other charges which Dunkin' Donuts may be required to pay to such third party by reason of such sales.

4. ADDITIONAL INFORMATION AND RECORDS REQUIRED. The Supplied Franchisee and Supplier Franchisee will, upon Dunkin' Donuts' request, compile, retain and deliver to Dunkin' Donuts such business, operating and financial information and records as Dunkin' Donuts may request from time to time. This shall include, without limitation, true and complete copies of production records, daily delivery receipts, credit and payment records, invoices, throwaway records, weekly summaries of receipts and records, in addition to all other information and records required under their Franchise Agreements and Dunkin' Donuts leases, if applicable. Each invoice will be in a form approved from time to time by Dunkin' Donuts and show all products produced for and delivered to, and the amounts paid by, the Supplied Franchisee.

5. TERM. This Agreement will expire on the earlier of the following dates: 1) the termination or expiration of Supplier Franchisee's Franchise Agreement for the Supplying Shop; 2) On or before April 25, 2006 or the opening of a Dunkin' Donuts Producing Unit approved by Dunkin' Donuts Incorporated, or whichever occurs first; or 3) upon receipt of written notice of termination, with or without cause, by Dunkin' Donuts. In no event, however, will the term of the Product Supplier Agreement be less than the term of the Supplied Shop's franchise agreement, unless sooner terminated by Dunkin' Donuts. Termination of this Agreement shall not affect Dunkin' Donuts' rights to receive and the Supplier Franchisee and Supplied Franchisee's duty to provide records and information under Paragraph 4.

6. PRODUC_f SUPPLIER AGRCEMENT.   It is agreed _ the parties that the Supplier Franchisee and Supplied Franchisee will negotiate a Product Supplier Agreement using the suggested form of Dunkin' Donuts Supplier Agreement attached hereto.   The Product Supplier Agreement will be attached hereto and is incorporated herein by reference. It is acknowledged by the parties that Dunkin' Donuts has a vested interest in enforcement of the Product Supplier Agreement to ensure the continued supply of product to the Supplied Franchisee's Shop and is, therefore, a beneficiary and may enforce the Agreement as to either party by seeking injunctive relief, filing a claim for damages or both, including legal fees and costs.

7.    ASSUMPTION OF RISK.   The Supplier Franchisee and Supplied Franchisee assume the risk of non-performance by the other party that may result in interruption or discontinuance of bakery products being delivered to the Supplied Shop and will not look to Dunkin' Donuts to enforce the Agreement on their behalf or seek damages or other relief from Dunkin' Donuts for any losses that they may sustain.

8.   OBLIGATIONS OF SUPPLIED FRANCHISEE UPON LOSS OF SUPPLY OF BAKERY PRODUCTS. In the event for any reason the Supplied Franchisee loses its source of supply of products, the Supplied Franchisee must promptly develop an alternative source of supply from another approved franchisee or develop, construct or purchase a product manufacturing facility or a Dunkin' Donuts shop approved for the manufacture of products.   Failure to do so shall be a default under this Agreement and the Supplied Franchisee's Franchise Agreement. Failure to cure the default within 30 days following receipt of written notice of the default shall result in termination of this and all ancillary agreements with Dunkin' Donuts.

9.   INDEMNIFICATION.   The parties agree individually and severally to hold Dunkin' Donuts harmless from any losses including legal fees and costs to enforce this Agreement, which may result from, among other things, interruption of business or closing of the Supplied Shop during the term of this Agreement, as a result of breach of this Agreement by either the Supplier Franchisee or Supplied Franchisee.

10. MISCELLANEOUS.

A. With respect to the specific matters set forth in this Agreement, this Agreement will be deemed to amend the Franchise Agreements for the Supplier Shop and the Supplied Shop and the Dunkin' Donuts lease, if any. No other terms and conditions of the Franchise Agreements or the leases or subleases are modified or extinguished by this Amendment. This Agreement will be binding on the parties, their guarantors, heirs, personal representatives, successors and assigns.

B.  The Supplied Franchisee shall order and the Supplier Franchisee shall deliver products approved by Dunkin' Donuts in accordance with standards established by Dunkin' Donuts from time to time.  Such standards may include, without limitation, requirements relating to product mix, quantity, time and frequency of delivery, product quality, manufacturing, mode of delivery, system of delivery storage, handling, finishing, throwaways and equipment.

Supplier Franchisee:

Witness

DOUGH4EVER, INC.

_____
Witness

By_____
James T. Fabris, President

Supplied Franchisee

Witness

KNZ 110TH LEXINGTON, LLC

_____
Witness

By_____
Imran Ali, Managing Member

Dunkin' Donuts

Dunkin' Donuts Incorporated

By_____
Wendy Deas, Asst. Secretary

THIS AGREEMENT IS NOT BINDING UPON DUNKIN' DONUTS UNTIL EXECUTED AND ATTESTED BY ITS AUTHORIZED REPRESENTATIVES

SUGGESTED FORM OF DUNKIN' DONUTS PRODUCT SUPPLIER AGREEMENT

## PRODUCT SUPPLIER AGREEMENT

**FOR SUPPLIER SHOP ("Supplier Franchisee") AND SUPPLIED SHOP ("Supplied Franchisee")**

Supplier Franchisee Shop Address: <u>Route 46 & Bergen Blvd., Fort Lee, New Jersey</u>  PC# <u>336078</u>

Supplied Franchisee Shop Address: <u>1773 Lexington Avenue, New York, New York</u>    PC# <u>339380</u>

Date:  4-15-04

A.    **GENERAL.** The Supplied Franchisee shall buy Dunkin' Donuts bakery products exclusively from the Supplier Franchisee for resale at the Supplied Franchisee's Shop. The Supplier Franchisee shall manufacture, sell and deliver to the Supplied Franchisee bakery products ordered by the Supplied Franchisee. The Supplied Franchisee, bakery products ordered, and Supplier Franchisee must all be approved in writing by Dunkin' Donuts. The Supplied Franchisee and the Supplier Franchisee each agree to comply with all applicable laws and regulations and with all Dunkin' Donuts requirements as in effect from time to time. Without limiting the generality of the foregoing, the methods of manufacturing, equipment, product quality, product mix, quantities, frequency and times of production and delivery, transportation and handling must be approved by Dunkin' Donuts and must meet Dunkin' Donuts' requirements and standards in effect from time to time.

B.    **PRICE.** See Schedule A which is hereby incorporated by reference.

C.    **PRODUCT ORDERING.** The Supplied Franchisee shall, subject to Dunkin' Donuts' written approval, after consultation with the Supplier Franchisee, determine the number, mix, and frequency of delivery of bakery products to be delivered to the Supplied Franchisee. Orders for the following day's products will be telephoned, faxed or hand delivered to Supplier Franchisee by 10 a.m. Orders will be presented on a standard product order form approved by Dunkin' Donuts. The production and delivery schedules shall be subject to the approval of Dunkin' Donuts. The product shall be finished by Supplier Franchisee or by the Supplied Franchisee as determined by Dunkin' Donuts.

D.    INVₜ    ES. The Supplier ₁ₜanchisee shall bill the Suₚ  ₑd Francₓₐsee weekly for the products. Unless otherwise agreed, the business week will begin on Sunday and end on Saturday. The Supplied Franchisee will pay the Supplier Franchisee's invoices within seven (7) days of receipt.

E.    TERM. Unless otherwise terminated as provided herein, the term of this Product Supplier Agreement shall continue until (a) On or before April 25, 2006 or the opening of a Dunkin' Donuts Producing Unit approved by Dunkin' Donuts Incorporated, or whichever occurs first; or (b) termination or expiration of the Supplier's Franchise Agreement; (c) Dunkin' Donuts written notice to Supplier and the Supplied Franchisee that the Supplier Franchisee is no longer approved as a Supplier to the Supplied Franchisee. Supplier Franchisee and the Supplied Franchisee may mutually terminate this Agreement earlier with Dunkin' Donuts prior written consent.

F.    OTHER RESPONSIBILITIES OF THE SUPPLIER AND SUPPLIED FRANCHISEE.

1. The Supplier Franchisee and Supplied Franchisee must enter into, and comply with, a Dunkin' Donuts Product Supplier Consent Agreement for this transaction.

2. The Supplier Franchisee must deliver to the Supplied Franchisee at least twice daily (unless Dunkin' Donuts otherwise specifies) products meeting Dunkin' Donuts' requirements.

3. The Supplier Franchisee must bear all costs of: producing and delivering products meeting Dunkin' Donuts requirements and obtaining, operating and maintaining a delivery/support vehicle and system meeting Dunkin' Donuts' requirements.

4. The Supplier Franchisee and the Supplied Franchisee must comply with Dunkin' Donuts Franchise Agreement and Lease, if applicable, and all other agreements with Dunkin' Donuts.

G.    OTHER DUNKIN' DONUTS LOCATIONS. Dunkin' Donuts' right to approve others to market Dunkin' Donuts Products at any place other than the Supplied Shop is not limited in any way by this Agreement.

H.    NOTICES. Notices must be in writing and sent prepaid by telecopier, certified mail or private courier, to the parties at their principal places of business, or such other address as the party to receive the notice specifies in writing to the others. Copies of all notices must be sent at the same time by the party providing notice to Dunkin' Donuts Incorporated, P.O. Box 317, Randolph, Massachusetts 02368, Attention: Legal Department.

I.   NO W   VER. No party is to be deemed to waive its    t to enforce one or more provisions of these Terms and Conditions if it does not enforce the provision(s) on one or more occasions.

J.   NO REPRESENTATIONS OR WARRANTIES. The parties acknowledge and agree that Dunkin' Donuts, the Supplied Franchisee and the Supplier Franchisee make no representations or warranties as to the sales, profits, or other benefits, if any, that may result from this form of distribution; further, that Dunkin' Donuts assumes no obligation or liability for the Supplied Franchisee or the Supplier Franchisee's failure to comply with this Product Supplier Agreement.

K.   TERMINATION. If either the Supplier Franchisee or the Supplied Franchisee are not complying with the terms and conditions of this Agreement, either party may give the non-complying party written notice of noncompliance. The non-complying party will have thirty (30) days (seven days where Dunkin' Donuts determines that its requirements are being violated) to cure such default. If the non-complying party has not cured such default within that time, the complying party may terminate this Product Supplier Agreement by sending a notice of termination to all other parties. Notwithstanding the foregoing, the Supplier Franchisee may terminate this Product Supplier Agreement on seven days notice if the Supplier Franchisee has given the Supplied  Franchisee two or more valid notices of late or non-payment in any period of twelve consecutive months; and the Supplied Franchisee may terminate this Agreement on seven days notice if the Supplier Franchisee has failed (except as set forth in Item L.) to make three or more days' deliveries within any period of twelve (12) consecutive months.

L.   EXCUSED PERFORMANCE. A party may be excused from performing its obligations under this Product Supplier Agreement only if it is prevented or delayed in performing because of a reason beyond the party's reasonable control. Examples include acts of God, strikes, lockouts, material or labor restrictions, actions by governmental authorities, riots, floods, and other causes the excused party could not reasonably anticipate or prepare for. The foregoing notwithstanding, the Supplier Franchisee agrees to use its best efforts to timely produce and deliver the products to the Supplied Franchisee meeting Dunkin' Donuts' requirements. In the event that the Supplier Franchisee is unable or unwilling to so deliver products to the Supplied Franchisee, the Supplied Franchisee may purchase the products from another Dunkin' Donuts shop approved in writing by Dunkin' Donuts for that purpose. If it costs the Supplied Franchisee more to purchase the replacement products than it would have cost to purchase the products from the Supplier Franchisee, the Supplier Franchisee shall reimburse the Supplied Franchisee the difference.

M. POS. ARTICIPATION. Some of the obligations of the parties included in this Product Supplier Agreement either cannot or may not be performed until after that party's participation in the Program is ended. The parties agree to perform their obligations under this Product Supplier Agreement even after the Agreement is ended.

N.    ASSIGNMENT; TRANSFER. This Product Supplier Agreement may be assigned by either party only with the prior written approval of the other party and Dunkin' Donuts. This Agreement shall be binding upon and inure to the benefit of any successors or assigns of the parties hereto. If either party transfers its interest to a third party, such transfer shall be subject to the assumption of the obligations of the transferring party contained in the Agreement and the prior written approval of Dunkin' Donuts. If either the Supplier Shop or the Supplied Shop is sold or transferred, the purchaser or transferee shall assume and be bound by this Agreement.

O.    MEDIATION AND ARBITRATION. Any claim or controversy arising out of or relating to this Product Supplier Agreement shall be referred first to non binding mediation and, failing resolution, to arbitration by a single arbitrator in accordance with the then current rules of the American Arbitration Association for Commercial Disputes in the locale proximate to the Supplied Franchisee and Supplier Franchisee's Shops. The costs of mediation/arbitration shall be borne equally by the Supplier and Supplied Franchisee.

P.    INFORMATION AND RECORDS. The Supplier Franchisee and the Supplied Franchisee shall compile, retain and provide Dunkin' Donuts with all information and records it may from time to time request with respect to their business, operations and financial condition.

Q.    CHANGE OR AMENDMENT. The Supplier Franchisee and the Supplied Franchisee shall not change or amend this Product Supplier Agreement without the prior written approval of Dunkin' Donuts. If amended with the prior written approval of Dunkin' Donuts, the amended Product Supplier Agreement shall be the Agreement referred to in the Dunkin' Donuts Product Supplier Consent Agreement for the Supplier Shop and Supplied shop.

DOUGH4EVER, INC.                    Supplier

                                    Franchisee

By _____

James T. Fabris, President

Dated: __4-15-__, 2004

KNZ 110TH 1 EXINGTON LLC           Supplied

                                    Franchisee

By _____

Imran Ali, Managing Member

SCHEDULE A: SUPPLIER AGREEMENT: PRICE

## INTRODUCTORY STATEMENT

Pricing will be negotiated and agreed between the Supplier Franchisee and the Supplied Franchisee. Dunkin' Donuts does not set prices. Dunkin' Donuts makes available suggested pricing formats for consideration by the Supplier Franchisee and the Supplied Franchisee.

As a general framework for pricing decisions, Dunkin' Donuts suggests the following:

1. Pricing should be reasonable for both parties.
2. The agreement should provide a mechanism for adjusting price over time so that the respective margins of the Supplier Franchisee and Supplied Franchisee are preserved.
3. To the extent practicable, select a pricing mechanism that is self adjusting; e.g. percentage of prevailing retail price.
4. Provide for non-binding mediation and binding arbitration if an impasse is reached regarding pricing in the future.
5. Seek your accountant and/or lawyer's assistance.
6. Consider variables such as
   - who delivers/picks up?
   - who finishes?
   - are there alternate approved or approvable Dunkin' Donuts supplier/franchisees?
   - what is incremental cost to Supplier Franchisee of supplying Supplied Franchisee?

## SUGGESTED PRICING FORMATS

1. Adjusting Mechanism Based Primarily on Food Cost Increases over 5%.

   Supplier Franchisee will charge the following prices for supplying and delivering Products:

| Description | Price per Dozen |
|-------------|-----------------|
| Donuts | $2.95 |
| 48 Munchkins = 1 Dozen | $2.95  ea dozen |
| Muffins | $ SELF PRODUCE |
| Fancies | $ 3.0 .49 EACH (6?) |
| Croissants | $ SELF PRODUCE |
| Cookies | $ SELF PRODUCE |
| Brownies | $ NONE |
| Bagels | $ SELF PRODUCE |

Supplied Franchisee shall determine the percentage of products that will be throwaways for each store and will calculate its orders accordingly. Supplier Franchisee shall not give credits to Supplied Franchisee for products that are throwaways.

The above-referenced prices shall be increased quarterly on each March 31, June 30, September 30 and December 31 based on the percentage increase in the price of ingredients used in the production of Products (food costs); provided however, that an adjustment will only be made if prices increase in the aggregate by more than five percent (5%) over the prices in effect on the date of this Product Supplier Agreement or the date of the last price increase under this Agreement, as the case may be.

In addition to the adjustment in the preceding paragraph, prices for all products will be subject to adjustment annually on each anniversary hereof by mutual agreement of Supplier Franchisee and Supplied Franchisee. If the parties are unable to agree on pricing, the matter shall be submitted to non-binding mediation. If the matter is not so resolved, it shall be submitted to binding arbitration for final determination of price. The parties agree to meet quarterly to review the terms of this Agreement and the activities taking place hereunder.

2. Adjusting Mechanism Based Primarily on Percentage of Retail Price.

Supplier will charge Supplied Franchisee the following prices for supplying and delivering Products:

| Description | Price Per Dozen | % of Retail Price |
|---|---|---|
| Donuts | $ | % |
| Munchkins | $ | % |
| Muffins | $ | % |
| Fancies | $ | % |
| Bagels | $ | % |
| Croissants | $ | % |

N.A.

INTENTIONALLY LEFT BLANK.

I.A.

Supplied Franchisee shall determine the percentage of products that will be throwaways for each store and will calculate its orders accordingly. Supplier Franchisee shall not give credits to Supplied Franchisee for products that are throwaways.

Supplier Franchisee shall be entitled to increase prices to the Supplied Franchisee to reflect cost increases (not offset by cost decreases) relating to ingredients (food costs), labor, transportation or other costs directly attributable to the production and delivery of products to the Supplied Franchisee; provided, however, that such revised prices shall not exceed the percentages of the Retail Price (a) in the market; (b) the Supplied Franchisee's Shop; (c) the Supplier Franchisee's Shop, whichever is most relevant under the circumstances.

In addition to the adjustment in the preceding paragraph, prices for all products will be subject to adjustment annually on each anniversary hereof by mutual agreement of Supplier Franchisee and Supplied Franchisee. If the parties are unable to agree on pricing, such matter shall be submitted to non-binding mediation. If the matter is not so resolved, it shall be submitted to binding arbitration for final determination of price. The parties agree to meet quarterly to review the terms of this Agreement and the activities taking place hereunder.

PC# 339380

New York, NY

## TERMINATION OF SUPPLIER AGREEMENT AND RELEASE

**THIS AGREEMENT** made this 15th day of APRIL , 2004, by and between **DUNKIN' DONUTS INCORPORATED**, a Delaware corporation, with principal offices in Randolph, Massachusetts (hereinafter referred to as "**DUNKIN' DONUTS**"), and **KNZ 110TH LEXINGTON, LLC**, a New York limited liability company and **Imran Ali** (hereinafter collectively referred to as the "**UNDERSIGNED**").

### RECITALS

This Agreement terminates the Supplier Agreement dated May 22, 2003, between DUNKIN' DONUTS and the UNDERSIGNED (the "Franchise Agreement") relating to the DUNKIN' DONUTS SHOP at 1773 Lexington Avenue, New York, New York (the "Premises.") This Agreement also provides for a release by the UNDERSIGNED of DUNKIN' DONUTS.

NOW, THEREFORE, in consideration of the mutual covenants herein contained and other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto agree to the following:

### AGREEMENT

1. The Supplier Agreement is hereby terminated effective the date hereof.

2. The UNDERSIGNED agrees to indemnify and hold harmless DUNKIN' DONUTS, its predecessors in interest, successors and assigns, against any and all claims, liabilities or obligations arising out of or relating to the UNDERSIGNED'S operation of the Premises prior to the date hereof. DUNKIN' DONUTS assumes no obligations or liabilities which may have arisen during the course of the UNDERSIGNED'S operation of the Premises.

3. The UNDERSIGNED releases and forever discharges DUNKIN' DONUTS, its predecessors in interest, successors and assigns, from all debts, demands, actions, causes of action, contracts, claims, obligations and liabilities which the UNDERSIGNED now has or ever has had against DUNKIN' DONUTS or any corporation affiliated therewith from the beginning of the world to this date arising from or in connection with the Franchise Agreement terminated hereby including, but not limited to, any and all state or federal antitrust claims, or causes of action; state or federal securities law claims or causes of action; state or federal RICO claims or causes of action; breach of contract claims, fraud or misrepresentation, breach of fiduciary duty, unfair trade practices claims (state or federal) and all other claims and causes of action whatsoever.

1

**IN WITNESS WHEREOF,** THE PARTIES HERETO HAVE HEREUNDER SET THEIR HANDS AND SEALS THE DAY AND YEAR FIRST ABOVE WRITTEN.

("DUNKIN' DONUTS")

DUNKIN' DONUTS INCORPORATED

By:_____

Arthur Anasto, Asst. Secretary

("UNDERSIGNED")

KNZ 110TH LEXINGTON, LLC

WITNESS:

_____
, witness

By:_____

Imran Ali, Managing Member &
Individually

2

339380

PC# ~~338830~~
New York, NY

## GENERAL RELEASE

THIS GENERAL RELEASE is made this ____15____ day of ____Apr.____, 2004.

    **Sreenivasa Gade, Rahgav Ponnaluri, Jaideep G. Reddy, and Karthik B. Dhama**, resident in the State of New York, and **JAISRIKAR, LLC**, a New York limited liability company having its principal place of business at 1773 Lexington Avenue, New York, New York (each of the foregoing being collectively referred to herein as the "UNDERSIGNED") for and in consideration of the sum of One Dollar ($1.00) paid to them by DUNKIN' DONUTS INCORPORATED, and other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, do each hereby release, remise and forever discharge DUNKIN' DONUTS INCORPORATED, its predecessors, successors and assigns, parent, subsidiaries and affiliated corporations, officers, directors, agents, employees and representatives, past and present, of any and all of such corporations (all collectively referred to herein as "DUNKIN'"), of and from any and all claims, demands, causes of action, suits, debts, dues, duties, sums of money, accounts, reckonings, covenants, contracts, agreements, promises, damages, judgments, extents, executions, liabilities and obligations, both contingent and fixed, known and unknown, of every kind and nature whatsoever in law or equity, or otherwise, under local, state, or federal law, against any of them, which the UNDERSIGNED or their predecessors in interest, if any, ever had, now have, or which they, their heirs, executors, administrators, successors, or assigns hereafter can, shall, or may have; for, upon, or by reason of, any matter, cause, or thing whatsoever, from the beginning of the world to the date of these presents.

    Without limiting the generality of the foregoing, but by way of example only, this release shall apply to any and all state or federal antitrust claims or causes of action; state or federal securities law claims or causes of action; state or federal RICO claims or causes of action; breach of contract claims or causes of action; claims or causes of action based on fraud or misrepresentation; breach of fiduciary duty; unfair trade practices (state or federal); and all other claims and causes of action whatsoever.

    The UNDERSIGNED further agree for themselves and for their successors and assigns, to indemnify and hold harmless forever, DUNKIN', its predecessors, successors and assigns, parent, subsidiary and affiliated corporations, officers, directors, agents, employees and representatives, past and present, against any and all claims or actions which hereafter may be brought or instituted against any or all of them, or their successors and assigns, by or on behalf of anyone claiming under rights derived from the UNDERSIGNED, or any of them, and arising out of or incidental to the matters to which this Release applies.

    The UNDERSIGNED and DUNKIN' agree that this Release is not intended nor shall it be construed as an admission of any wrongdoing or liability and that it shall not be admissible in evidence in any suit or proceeding whatsoever as evidence or admission of any liability.

    The Undersigned who are signing this Release in a representative capacity on behalf of JAISRIKAR, LLC represent and warrant that they were duly authorized by action of the Operating Agreement of said limited liability company to execute this Release on its behalf.

    With respect to the matters hereinabove released, the UNDERSIGNED knowingly waive all rights and protection, if any, under Section 1542 of the Civil Code of the State of California, or any similar law of any state or territory of the United States of America. Section 1542 provides as follows:

> "1542 General Release; Extent. A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which, if known by him, must have materially affected his settlement with the debtor."

    IN WITNESS WHEREOF, the UNDERSIGNED executed this General Release on the day and year first above written.

WITNESS:

_____
Print name: _Amin DEmi_

_____
Print name: _BAIRAM JCRAwai_

_____
Print name: _____

_____
Sreenivasa Gade, Individually

_____
Rahgav Ponnaluri, Individually

_____
Jaideep G. Reddy, Individually (passive partner)

DDGENREL-12/98

Print name: JOHN Scott Caplan

WITNESS:

_____
                                    witness

_____
                                    witness

_____
Karthik B. Dharma, Individually (passive partner)

JAISRIKAR, LLC

By: _____
    Sreenivasa Gade, Managing Member

By: _____
    Ranga Ponnaluri, Managing Member

DDGENREL-12/98

IN WITNESS WHEREOF the parties hereto, intending to be legally bound hereby, have duly executed, sealed and delivered this agreement in triplicate, as of the date and year first written above. FRANCHISEE hereby acknowledges receipt of this Franchise Agreement, together with any amendments, at least five (5) business days prior to the date hereof. FRANCHISEE further acknowledges having carefully read this agreement in its entirety, including all Schedules identified above and the Personal Guaranty below (if applicable).

FRANCHISOR

ATTEST:

Susan J. Berry, Assistant Secretary

DUNKIN' DONUTS, INCORPORATED

Mark McClellan, Director of Retail Development

This agreement is not binding upon the above corporation(s) until executed and attested by an authorized officer.

**FRANCHISEE ACKNOWLEDGES SECTION 11 OF THE GENERAL TERMS & CONDITIONS OF THIS CONTRACT, WHICH PROVIDES FOR FRANCHISEE'S EXPRESS WAIVER OF RIGHTS TO A JURY TRIAL, TO PARTICIPATE IN CLASS ACTION LAWSUITS, TO OBTAIN PUNITIVE, MULTIPLE OR EXEMPLARY DAMAGES, AND TO BRING ANY CLAIM OR ACTION LATER THAN TWO YEARS AFTER THE DISCOVERY OF THE FACTS GIVING RISE TO SUCH CLAIM OR ACTION.**

FRANCHISEE

WITNESS/ATTEST:

Debbie Soopersaud
witness

KNZ 110TH LEXINGTON, LLC.

Imran Ali, Managing Member

## PERSONAL GUARANTEE BY SHAREHOLDERS OF A CORPORATION OR MEMBERS OF A LIMITED LIABILITY COMPANY

We, the undersigned, represent and warrant that we constitute

[ X ] one hundred percent (100%) of the members of the above FRANCHISEE limited liability company ("LLC")

organized under the laws of the state of **New York**. Waiving demand and notice, the undersigned hereby, jointly and severally, personally guarantee the full payment of FRANCHISEE's money obligations under Section 4 and the performance of all of FRANCHISEE's other obligations under this Franchise Agreement, including, without limitation, paragraph 6.3 and Section 8, in its entirety relative to the restrictions on the activities of FRANCHISEE. We personally agree that the Franchise Agreement shall be binding upon each of us personally. The undersigned, jointly and severally, agree that FRANCHISOR may, without notice to or consent of the undersigned, (a) extend, in whole or in part, the time for payment of FRANCHISEE's money obligations under paragraph 4; (b) modify, with the consent of FRANCHISEE, its money or other obligations hereunder; and/or (c) settle, waive or compromise any claim of FRANCHISOR against FRANCHISEE or any of the undersigned, all without in any way affecting the personal guarantee of the undersigned. This Guarantee is intended to take effect as a sealed instrument.

Debbie Soopersaud
witness

Imran Ali, individually

SDA # 339076

PC # 339380
New York, NY

## CERTIFICATION OF FRANCHISEE

DESCRIBE BELOW ALL PROMISES AND REPRESENTATIONS MADE BY FRANCHISOR THAT ARE NOT EXPRESSLY CONTAINED IN THE FRANCHISE AGREEMENT OR UNIFORM FRANCHISE OFFERING CIRCULAR BUT WHICH INFLUENCED FRANCHISEE'S DECISION TO SIGN THIS FRANCHISE AGREEMENT.

*If the answer is "none," please write "NONE" below.*



FRANCHISEE's completion of this page is a material inducement for FRANCHISOR to grant FRANCHISEE this Franchise. If FRANCHISEE fails to complete, sign and deliver this Certification of Franchisee page to FRANCHISOR along with the Franchise Agreement, FRANCHISOR will not counter-execute the Franchise Agreement or may void the Franchise Agreement if it already has been counter-executed.

THE UNDERSIGNED HEREBY CERTIFY THAT THE INFORMATION PROVIDED ABOVE IS TRUE, that FRANCHISEE had the opportunity to obtain the advice of an attorney, and that FRANCHISEE, and not FRANCHISEE's attorney or other representative, has executed this Certification of Franchisee.

The date of the Certification shall be the date on the Franchise Agreement

FRANCHISEE

WITNESS/ATTEST:

KNZ 110TH LEXINGTON, LLC

Debbie Soopersaud
                    witness

Imran Ali, Managing Member and individually